# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. CHRISTOPHER LEE DERRI, a/k/a JOHN STITES, Appellant. | DIVISION ONE No. 80396-4-I PUBLISHED OPINION |

DWYER, J. — Christopher Derri appeals from his convictions of three counts of robbery in the first degree. Derri contends that the information was constitutionally defective as to each count because it did not include all of the essential elements of robbery. Additionally, Derri asserts that the trial court erred by (1) admitting out-of-court and in-court identifications of him as the perpetrator, (2) denying his motion for a mistrial or dismissal with regard to count three after witness testimony revealed that the State had failed to disclose the existence of video footage that was potentially relevant to that count, and (3) refusing to instruct the jury on the law concerning missing evidence. Finally, Derri contends that he is entitled to a new sentencing hearing because the State failed to establish his criminal history by a preponderance of the evidence. Because Derri does not establish an entitlement to relief on any of his claims, we affirm.

I

On March 1, 2017, Christopher Derri, who is also known as John Stites, entered a branch of Chase Bank in Seattle, approached two employees at teller stations, and demanded money. Derri first approached David Fletcher, the branch manager. Fletcher greeted Derri. Derri initially responded by "mumbling." Derri then said to Fletcher, "[N]o dye packs, no bait money, this is a robbery, give me the money." In response, Fletcher and another employee, Jacob Price, emptied money from the drawers and put it on the counter of the teller stations. Derri was wearing a hooded jacket and, according to Price, the hood "[d]idn't really cover his face too much."

After Fletcher and Price put the money on the counter of the teller stations, Derri grabbed the money and placed it in a bag. Fletcher stated that Derri "kept asking for more and more" and also asked for the "merchant teller." Fletcher informed Derri that "it was their day off." Fletcher and Price then "started handing [Derri] rolls of coins" and "trays [of] . . . loose pennies and nickels." Derri subsequently left through the front entrance of the bank. The encounter lasted several minutes.

After Derri left, Fletcher and Price locked the doors to the bank. Fletcher then telephoned the police. Within a matter of minutes, several police officers arrived. Detective Len Carver obtained photographs and a video from the bank's surveillance cameras. After Detective Carver retrieved the photographs, he distributed them through a "bulletin" to other police officers affiliated with the Seattle Police Department. Upon seeing the photographs, Detective Scott Miller

2

determined that the individual depicted in the photographs "looked like" Derri. Detective Miller had met Derri on three occasions prior to seeing the photographs.

Detective Miller subsequently sent an e-mail message to Detective Carver, informing him that the individual in the photographs resembled Derri. After receiving Derri's name from Detective Miller, Detective Carver located a photograph of Derri and created a photomontage that featured Derri's photograph along with photographs of five other individuals.

On March 2, 2017, Detective Carver presented this photomontage to Fletcher and Price. Neither Fletcher nor Price identified any of the photographs as depicting the individual who robbed the bank.

On March 7, 2017, Derri entered a branch of HomeStreet Bank in Seattle and approached two employees, Hannah Amdahl and Andrew Hilen, who were located at teller stations. Amdahl recalled that Derri "came in and was mumbling, but eventually it became clear through his words that he was robbing us." According to Hilen, Derri initially stated the he "need[ed] . . . money now, [or] something to that effect." Derri then repeated his message stating, "I need your money. Please give me your money now."

Amdahl and Hilen emptied money out of the drawers and put it on the counter of their teller stations. Meanwhile, Derri paced back and forth between Amdahl and Hilen. After Amdahl and Hilen "had given him all the money," Derri took the money from the counter and put it in his pockets. Prior to leaving the bank, Derri told Amdahl and Hilen not to "call the cops until after [he] le[ft]." Derri

3

acquired approximately $6,000. The encounter lasted approximately three minutes.

After Derri left the bank, Amdahl and Hilen locked the doors and "wait[ed] for the police to arrive." Police officers arrived within minutes. A video and photographs of the robbery were retrieved from the bank's surveillance cameras.

Amdahl and Hilen recognized Derri as a person who had entered the bank approximately two weeks before the robbery. In late February, Derri had spoken to Amdahl about opening a bank account at HomeStreet Bank. During their conversation, Amdahl agreed to lower the bank's minimum balance requirement because Derri stated that he "didn't have the funds" to open an account. To remember the conversation, Amdahl wrote herself a note, which memorialized the name that was given by Derri: "John Stites." The following week, Amdahl wrote "2/24?" on the note in order to "remember what day it had happened."

On March 8, 2017, Detective Carver interviewed Amdahl. Detective Carver had assembled a photomontage using a different, more recent photograph of Derri. Upon reviewing the photomontage, Amdahl identified Derri's photograph and stated that she recognized Derri as the robber with 100 percent confidence. On March 9, Detective Carver showed the same photomontage to Hilen. Hilen identified Derri's photograph and stated that he recognized Derri as the robber with 98 to 99 percent confidence.

On March 10, 2017, Detective Carver showed the photomontage with the more recent photograph of Derri to both Fletcher and Price, individually. Detective Carver decided to show Fletcher and Price the second photomontage

because "the photograph that they were originally shown was older and there was a stark contrast between the two photographs." Price did not select any photograph from the photomontage. Fletcher, however, identified Derri's photograph and stated that he recognized Derri as the robber with 90 percent confidence.

On March 11, 2017, Derri entered the same HomeStreet Bank that he had robbed four days earlier. Amdahl and the branch manager, Dustin Foss, were present. Amdahl "saw [Derri's] face clearly and recognized him as the previous robber." As Derri entered the bank, Amdahl activated a "silent alarm." Derri then approached Amdahl and said something along the lines of "You know the drill." Amdahl gave Derri some money and then "backed up and said that was it." Derri then left the bank. The encounter lasted approximately one minute.

After Derri left, Foss locked the doors and Amdahl telephoned the police. A responding officer, Richard Lima, spoke with Amdahl and Foss. Amdahl and Foss provided the name "John Stites" to Officer Lima. Officer Lima obtained photographs that depicted the robbery from the bank's surveillance cameras. He did not, however, retrieve any video footage from the cameras. Several days after the robbery, Officer Lima retrieved video footage from Ken's Market, a business located across the street from HomeStreet Bank. This footage depicted the exterior of the bank both immediately before and after the robbery. On March 13, 2017, Derri was arrested.

The State charged "Christopher Lee Derri, aka John Stites" with three counts of robbery in the first degree: the first count occurring on March 1, 2017,

and "from the person and in the presence of David Fletcher and Chase Bank"; the second count occurring on March 7, 2017, and "from the person and in the presence of Hannah Amdahl, Andrew Hilen, and HomeStreet Bank"; and the third count occurring on March 11, 2017, and "from the person and in the presence of Hannah Amdahl." Following a jury trial, Derri was found guilty as charged. The trial court imposed a standard range sentence of 150 months of incarceration.

Derri appeals.

II

Derri first asserts that the information, which charged him with three counts of robbery in the first degree, was constitutionally defective as to each count because it failed to include all of the essential elements of robbery. This is so, Derri avers, because the information was required to state that he had used force or fear either to obtain or retain possession of the property at issue or to prevent or overcome resistance to the taking. We disagree.

Under both the United States and Washington Constitutions, an accused has a right to be informed of the criminal charges against him or her in order to facilitate the adequate preparation of a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 (amend. 10). Accordingly, a defendant must be provided a charging document setting forth every material element of the charge or charges against the defendant, along with all essential supporting facts. State v. McCarty, 140 Wn.2d 420, 425, 998 P.2d 296 (2000).

"The standard of review for evaluating the sufficiency of a charging document is determined by the time at which the motion challenging its sufficiency is made." State v. Taylor, 140 Wn.2d 229, 237, 996 P.2d 571 (2000). When a defendant challenges the sufficiency of the charging document before a verdict is rendered, the charging language must be strictly construed. Taylor, 140 Wn.2d at 237. When a defendant challenges the sufficiency after a verdict is rendered, the charging document must be construed liberally in favor of validity. Taylor, 140 Wn.2d at 237.

A challenge to the sufficiency of a charging document involves a question of constitutional due process and may be raised for the first time on appeal. State v. Holland, 77 Wn. App. 420, 426, 891 P.2d 49 (1995); RAP 2.5(a)(3). When, as here, an appellant raises such a challenge for the first time on appeal, we employ the two-pronged test originally set forth in State v. Kjorsvik, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991).

To satisfy the first prong, we must liberally construe the language of the charging document to determine if it contains the necessary elements of the crime charged. McCarty, 140 Wn.2d at 425. Notably, "[t]he State need not include definitions of elements in the information." State v. Johnson, 180 Wn.2d 295, 302, 325 P.3d 135 (2014).

If the charging document can be construed as containing the required elements, even if only in vague terms, we must then determine if the language resulted in any actual prejudice to the defendant (the second prong of the test). McCarty, 140 Wn.2d at 425. However, if the necessary elements cannot be

found in or even fairly inferred from the charging document, we presume prejudice without reaching the second prong of the test. McCarty, 140 Wn.2d at 425. The remedy for an insufficient charging document is reversal and dismissal of the charges without prejudice to the State's ability to refile. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008).

Derri was charged with three counts of robbery in the first degree in violation of RCW 9A.56.200, which provides, in pertinent part:

> (1) A person is guilty of robbery in the first degree if:
>    . . .
>    (b) He or she commits a robbery within and against a financial institution as defined in RCW 7.88.010 or 35.38.060.

The elements of robbery are set forth in the definitional statute:

> A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. *Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking*; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

RCW 9A.56.190 (emphasis added).

Here, Derri contends that the information, with regard to all three counts of robbery in the first degree, did not properly set forth the essential elements of the

crime of robbery.[1]  Specifically, Derri asserts that the information was required to recite the portion of the second sentence of RCW 9A.56.190 that we have emphasized above.  Because Derri did not raise this issue in the trial court, we apply the standard of review set forth in Kjorsvik, 117 Wn.2d at 106.  Accordingly, we must first determine whether the language of the information included all of the essential elements of the crime of robbery in the first degree.

We have already held—in the context of an information that was challenged as being constitutionally defective—that the essential elements of robbery do not include the contents of the second sentence of RCW 9A.56.190.  State v. Phillips, 9 Wn. App. 2d 368, 373-74, 444 P.3d 51, review denied, 194 Wn.2d 1007 (2019).  In so doing, we explained that the first sentence of RCW 9A.56.190 contains the statutory elements of robbery whereas the second sentence merely defines certain terms contained within that first sentence:

> The first sentence, which sets forth the statutory elements of robbery, includes the element of "the use or threatened use of immediate force, violence, or fear of injury."  The second sentence defines "force" and "fear" as used in sentence one.  "*Such force or fear* must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which

---

[1] The information contained identical statutory language for each of the three counts of robbery in the first degree, differing only with regard to the particular dates and complainants.  The following is an example of the language used in the information:

Count 1 Robbery In The First Degree

That the defendant Christopher Lee Derri, aka John Stites, in King County, Washington, on or about March 1, 2017, did unlawfully and with intent to commit theft take personal property of another, to-wit:  U.S. currency, from the person and in the presence of David Fletcher and Chase Bank, who had an ownership, representative, or possessory interest in that property, against his will, by the use or threatened use of immediate force, violence and fear of injury to such person or his property and to the person or property of another, and that he did commit the robbery within and against a financial institution defined in RCW 7.88.010 or RCW 35.38.060, to wit:  Chase Bank;

Contrary to RCW 9A.56.200(1)(b) and 9A.56.190, and against the peace and dignity of the State of Washington.

cases the degree of force is immaterial." (Emphasis added.) It also defines to "obtain" or "retain" as a form of "take," as used in sentence one.

Phillips, 9 Wn. App. 2d at 377 (quoting RCW 9A.56.190).

In other words, "the statutory elements of robbery are set forth in the first sentence while sentence[] two . . . [is a] mere definitional statement[]." Phillips, 9 Wn. App. 2d at 377. Accordingly, an information that charges a defendant with robbery need not allege that the defendant used force or fear either to obtain or retain possession of the property at issue or to prevent or overcome resistance to the taking.

Derri, however, asserts that a different outcome is compelled by our Supreme Court's decision in State v. Pry, 194 Wn.2d 745, 452 P.3d 536 (2019). Derri argues that the court in Pry rejected the principle, which we relied on in Phillips, that statutory provisions that are merely definitional need not be included in the information. Instead, according to Derri, the information must contain all of the "fact[s] [that are] essential to proving the illegality of the offense."[2] See Pry, 194 Wn.2d at 752 ("An 'essential element is one whose specification is necessary to establish the very illegality of the behavior' charged." (quoting State v. Johnson, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992))). Derri is wrong.

Indeed, the Pry decision expressly acknowledged the principle that "[a] charging document is not required to define essential elements." 194 Wn.2d at 752. While affirming our decision in the case, the Pry court invoked this principle in determining whether an information, which charged a defendant with rendering

---

[2] Br. of Appellant at 14.

criminal assistance, contained all of the essential elements of that offense. The information in Pry provided that the defendant "'rendered criminal assistance to a person who had committed or was being sought for any class A felony; contrary to the Revised Code of Washington 9A.76.070(1).'" Pry, 194 Wn.2d at 753-54. Significantly, RCW 9A.76.070(1) states: "A person is guilty of rendering criminal assistance in the first degree if he or she renders criminal assistance to a person who has committed or is being sought for murder in the first degree or any class A felony." Thus, according to the court, the defendant therein "was charged with 'rendering criminal assistance,' and the information told him this meant that he was charged with 'rendering criminal assistance.'" Pry, 194 Wn.2d at 754.

The court then determined whether RCW 9A.76.050, which is entitled "Rendering criminal assistance—Definition of term," either provided the essential elements of the offense or merely defined those elements. Pry, 194 Wn.2d at 754-55. The court concluded that the contents of that statutory provision were not merely definitional but rather set forth the essential elements of the offense of rendering criminal assistance. Pry, 194 Wn.2d at 756. Likewise, in Phillips, we held that the first sentence of RCW 9A.56.190, which is entitled "Robbery—Definition," contained the statutory elements of robbery. 9 Wn. App. 2d at 377.

Derri next contends that our Supreme Court, in State v. Johnson, 155 Wn.2d 609, 121 P.3d 91 (2005), held that the second sentence of RCW 9A.56.190 includes a statutory element of robbery. Not so. The issue in Johnson was "whether a robbery conviction can be based upon force used to escape after peaceably-taken property has been abandoned." 155 Wn.2d at

11

609-10. The court held that a robbery conviction could not be so based because Washington law incorporates the "transactional" view of the crime of robbery, meaning "the force must be used to obtain or retain property, or to prevent or overcome resistance to the taking." Johnson, 155 Wn.2d at 610. In Phillips, we explained that the Johnson "decision makes clear the relationship between the first and second sentences of RCW 9A.56.190." 9 Wn. App. 2d at 377. Whereas the first sentence provides the essential elements of robbery, the second sentence defines certain terms contained within the first sentence to explain Washington's "transactional" view of robbery. Phillips, 9 Wn. App. 2d at 377.

Derri also asserts that our Supreme Court's decision in State v. Allen, 159 Wn.2d 1, 147 P.3d 581 (2006), recognized that the second sentence of RCW 9A.56.190 includes a statutory element of robbery. We disagree. In Allen, the court examined whether sufficient evidence supported a defendant's conviction of aggravated first degree murder, with robbery in the first or second degree as the aggravator. 159 Wn.2d at 9-10. The court described the State's burden of proof—under the specific facts of that case—as follows:

> Thus, to establish the aggravating factor of robbery *in this case*, the State had to prove beyond a reasonable doubt that Allen: (1) took the cashbox from his mother's person or in her presence (2) against her will and (3) used force or fear to take the cashbox or to prevent his mother from resisting the taking.

Allen, 159 Wn.2d at 9 (emphasis added).

In Phillips, we explained that this language did not add to the statutory elements of robbery:

> [T]he Allen court was not engaged in announcing a new statutory element of robbery. Rather, it was discussing what the State—in

12

> that case, as the case had been tried—had to establish to prove guilt of the charge. There are no statutory elements of robbery requiring proof of "cashboxes" or "mothers."

9 Wn. App. 2d at 380.

Finally, Derri contends that the information was constitutionally defective because, in State v. Todd, 200 Wn. App. 879, 403 P.3d 867 (2017), Division Three ruled that the statutory elements of robbery include the second sentence of RCW 9A.56.190. Although a panel of Division Three judges did, in fact, so hold, they cited to our Supreme Court's decision in Allen in support of their determination. Todd, 200 Wn. App. at 885-86. But, as already explained, the Allen opinion did not, in fact, announce a new statutory element of robbery. The decision in Todd is less well-reasoned than our decision in Phillips. Today we follow Phillips.

In sum, the information herein was not required to provide that Derri had used force or fear either to obtain or retain possession of the property at issue or to prevent or overcome resistance to the taking. Because the first prong of the Kjorsvik standard is satisfied, Derri must show actual prejudice flowing from any vagueness in the charging document to obtain relief. He has neither shown nor alleged such prejudice. Thus, the information charging Derri with three counts of robbery in the first degree was constitutionally sufficient. See State v. Nonog, 169 Wn.2d 220, 231, 237 P.3d 250 (2010) ("Because [the appellant] does not argue that he was actually prejudiced by the State's charging language, the information is constitutionally sufficient." (citation omitted)).

Accordingly, Derri's assignment of error fails.

13

III

Derri asserts that the trial court erred by admitting at trial certain out-of-court and in-court identifications of him. In particular, Derri contends that certain out-of-court identifications resulted from unduly suggestive identification procedures and, in turn, the in-court identifications of him were tainted by these procedures. We disagree.

A

"[T]he admission of evidence of a photo identification is reviewed under the same standard as any other evidentiary ruling—abuse of discretion." State v. Kinard, 109 Wn. App. 428, 435, 36 P.3d 573 (2001).

> A trial court abuses its discretion only if any of the following is true:
> (1) The decision is "manifestly unreasonable," that is, it falls "outside the range of acceptable choices, given the facts and the applicable legal standard";
> (2) The decision is "based on untenable grounds," that is, "the factual findings are unsupported by the record;" or
> (3) The decision is "based on untenable reasons," that is, it is "based on an incorrect standard or the facts do not meet the requirements of the correct standard."

State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). Alternatively, a trial court abuses its discretion when "no reasonable judge would have ruled as the trial court did." State v. Mason, 160 Wn.2d 910, 934, 162 P.3d 396 (2007) (citing State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)); In re Marriage of Landry, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985).

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the

photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). In determining whether an out-of-court identification procedure violates due process, trial courts conduct a two-step inquiry. First, the defendant "bears the burden of showing that the identification procedure was impermissibly suggestive." State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). "If [the defendant] fails, the inquiry ends." Vickers, 148 Wn.2d at 118. Second, "[i]f [the defendant] proves the procedure was suggestive, the court then considers, based upon the totality of the circumstances, whether the procedure created a substantial likelihood of irreparable misidentification." Vickers, 148 Wn.2d at 118.

When the trial court determines whether a photographic identification procedure created a substantial likelihood of irreparable misidentification, the factors to be considered by the court include:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.

State v. Linares, 98 Wn. App. 397, 401, 989 P.2d 591 (1999); see Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

15

B

Derri claims that the identification procedure concerning Fletcher was impermissibly suggestive both because (1) Detective Carver showed Fletcher two photomontages and Derri was the only person appearing in both montages, and (2) Derri was the only person with a neck tattoo featured in the montages. Next, Derri argues that the identification procedure regarding Amdahl was impermissibly suggestive because Detective Carver showed her a photomontage wherein Derri was the only individual featured with a neck tattoo. Finally, Derri asserts that the identification procedure concerning Hilen was impermissibly suggestive both because Detective Carver (1) showed Hilen photographs from the March 1 robbery of Chase Bank before showing Hilen the photomontage, and (2) showed Hilen a photomontage wherein Derri was the only individual featured with a neck tattoo.

The trial court ruled that none of the photographic identification procedures were impermissibly suggestive. Additionally, the trial court determined that the procedures did not create a substantial likelihood of misidentification. In doing so, the trial court explained:

> Even if the Court were to have found the montage procedures were impermissibly suggestive, the Court finds that the Biggers factors are met in this case. So the totality of the circumstances does not give rise to a substantial likelihood of irreparable misidentification. First, each of the witnesses had an opportunity to observe the bank robber. Mr. Fletcher greeted the bank robber and interacted with him. Ms. Amdahl claims to have seen the bank robber before and even recalled his name, and on the day of the robbery she along with Mr. Hilen were the tellers who were ordered to remove money from the drawers. Both observed the bank robber for the time that he was in the bank.

16

Second, all the witnesses described[] [t]he defendant, his appearance, and his demeanor in sufficient detail to establish that they were paying attention to the bank robber. Third, the descriptions of the bank robber are all sufficiently consistent with the attributes of Mr. Derri. Fourth, each of the three individuals showed high levels of certainty in the identification, 90 percent for Mr. Fletcher, 100 percent for Ms. Amdahl, and 98 to 99 percent for Mr. Hilen. And finally, all identifications were made sufficiently close to the date of the robbery, the longest being nine days after the robbery. So for these reasons, the Court finds that the out-of-court identifications are reliable.

Because the trial court properly exercised its discretion by concluding that the identification procedures in question did not create a substantial likelihood of misidentification, we need not opine as to whether the procedures were impermissibly suggestive. As explained above, a trial court abuses its discretion when its decision is "based on untenable grounds or untenable reasons," or "if its decision is manifestly unreasonable." Littlefield, 133 Wn.2d at 46-47. The trial court herein did not abuse its discretion in ruling as it did.

C

First, the trial court's decision was not based on untenable grounds. A trial court's decision "is based on untenable grounds if the factual findings are unsupported by the record." Littlefield, 133 Wn.2d at 47. Here, the trial court's factual findings were supported by the evidence that was before the court when it ruled on Derri's CrR 3.6 motion.[3]

---

[3] We consider the factual record that was before the trial court when it ruled on Derri's motion to suppress the identifications made by Fletcher, Amdahl, and Hilen. Although a hearing was conducted on the motion, neither party presented any testimony during this hearing. Rather, the hearing was limited to the parties' arguments regarding whether the identification procedures in question violated due process requirements. The parties did, however, file various documents along with briefs concerning Derri's motion to suppress the identifications. Accordingly, in determining whether the trial court abused its discretion by denying Derri's motion to suppress the identifications made by Fletcher, Amdahl, and Hilen, we properly consider the information that was contained within these documents.

The trial court's factual finding that "each of the witnesses had an opportunity to observe the bank robber" is supported by the evidence in the record. In an initial incident report dated March 1, 2017, a police officer wrote that "Fletcher stated that a white male entered the bank, walked around for a minute and then demand[ed] that he and his staff put money into a dark brown satchel that he was holding in his hands." The robber "faced the front counter and began talking very fast and incoherently holding a brown satchel out in front of him." Additionally, the robber "told Fletcher repeatedly to 'do it now' while holding the bag open in front of him and told Fletcher not to make him come over the counter." Fletcher also recollected that the robber stated that "he was not kidding and that he wanted the merchant teller" and "asked for wrapped $20's in the bottom drawer and told the staff not to give him anything with dye packs." Fletcher then "put the trays of money on the counter and the [robber] took the whole tray and stuffed it into his satchel." Afterward, the robber approached Price and took money that Price had put on the counter. The robber then exited the bank. On March 2, Detective Carver interviewed Price, and Price recalled that he was able to see the robber's face during the robbery.

With regard to the March 7 robbery of HomeStreet Bank, Amdahl stated the following in an interview with Detective Carver that took place the day after the robbery:

> [T]he [robber] came . . . through the door and I looked up and he was almost to my station. Um he was wearing a black wind breaker or um kind of a rain jacket of some kind with the um hoodie pulled up and the strings pulled so it was tight against his face, so you could only see his face.

Amdahl stated that the robber was "mumbling" and then "said um something along the lines of um this is a robbery, uh give me your money." Amdahl and Hilen started to put "money on the table," and the robber "kept saying like more, more." Amdahl recalled that the robber told her "no dye packs and no devices." Amdahl and Hilen "eventually . . . put pretty much all the money that [they] had on" the counter. Amdahl recalled observing the robber "look[] through [the money]" and "tak[e] some [of] the rubber bands off and flip[] through them." At one point, the robber asked for the "merchant teller" and Amdahl informed him, "I don't know what that is and we don't have one of those."

Two days after the March 7 robbery, Detective Carver interviewed Hilen. During this interview, Hilen recalled that he initially "heard" the robber approach his teller station before "demanding that [he and Amdahl] remove [the] money from the bottom drawers." Hilen stated that the robber "requested that probably two or three or four times" before he and Amdahl "pick[ed] up on what he wanted." Then, according to Hilen, "eventually [Amdahl] started givin' [the robber] money" and Hilen "followed suit" and "provided the [robber] with cash." During this time, the robber "was pacing back and forth between" Hilen and Amdahl. Hilen stated that he "g[ave] [the robber] what he wanted but very slowly." After Hilen and Amdahl handed the robber the money, the robber "spent maybe fifteen seconds in front of both [of the] teller lines . . . stuffing money into his coat pockets." The robber "was having real trouble getting it into his pocket[s]." Hilen recalled thinking that, while the robber was struggling, "it was

19

sort of funny for a little bit." The robber then "looked at both [Amdahl] and [Hilen] and apologized . . . on his way out the door."

Notably, following the March 7 robbery of HomeStreet Bank, Amdahl informed a police officer that she recognized the robber as a person who had come into the bank approximately two weeks earlier. On that day, an individual had entered the bank and asked Amdahl about opening an account. Amdahl agreed to lower the minimum balance requirement for opening an account and subsequently wrote a note to make a record of the agreement. On this note, Amdahl wrote down the name "John Stites."

In light of the evidence summarized above, the trial court's finding that "each of the witnesses had an opportunity to observe the bank robber" is supported by the record that was before the trial judge when the judge ruled on Derri's motion.

Next, the trial court's finding that "all of the witnesses described[] [t]he defendant, his appearance, and his demeanor in sufficient detail to establish that they were paying attention to the bank robber" is also supported by the evidence that was before the court when it ruled on Derri's motion to suppress. In the initial incident report dated March 1, 2017, a police officer stated that "Fletcher described the male as approximately 5'11 tall, very thin with a sunken in face." Likewise, in a transcript from an interview with Detective Carver, Amdahl stated that the robber "had uh sunken in eyes and just his-he looked very emaciated in the face." Additionally, Hilen informed Detective Carver that the robber was "very skinny," weighed approximately "a hundred and forty-five pounds," had "sandy

brownish blonde hair," and had "a very weathered face." All three of these descriptions were made before the witnesses were shown any of the photomontages in question.

The trial court's finding that "the descriptions of the bank robber are all sufficiently consistent with the attributes of Mr. Derri" is also supported by the evidence that was before the court. Indeed, the parties had filed numerous photographs of Derri with the court. In these photographs, Derri may be fairly described as being skinny and having a "sunken in" or "weathered" face.

Furthermore, the trial court's finding that each of the witnesses showed a high level of certainty in identifying Derri is supported by the evidence that was before the trial judge. The second time Fletcher was presented with a photomontage of Derri, he wrote a note next to Derri's photograph that stated, "I would say with 90% confidence that this is the fellow that robbed the bank." After Amdahl identified Derri's photograph from the photomontage, she stated that she was 100 percent confident that the individual featured in the photograph was the same person who had robbed HomeStreet Bank on March 7. Additionally, when Hilen identified Derri's photograph from the photomontage, he stated that he was 98 to 99 percent confident that the individual featured in that photograph had robbed the bank.

Finally, the trial court's finding that "all identifications were made sufficiently close to the date of the robbery" was supported by the evidence. Amdahl identified Derri's photograph on March 8, 2017, which was one day after the March 7 robbery of HomeStreet Bank. Hilen identified Derri's photograph on

21

March 9, 2017, which was two days after that robbery. And Fletcher identified Derri's photograph on March 10, 2017, which was nine days after the March 1 robbery of Chase Bank.

Thus, the trial court's determination was not based on untenable grounds.

D

Neither was the trial court's decision based on untenable reasons. Again, a trial court's decision "is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Littlefield, 133 Wn.2d at 47. In determining whether the identification procedures created a substantial likelihood of misidentification, the trial court applied the correct legal standard. Indeed, the trial court considered the totality of the circumstances and applied the five factors outlined by the Supreme Court in Biggers, 409 U.S. at 199-200. Moreover, the evidence considered by the trial court was relevant to, and met the requirements of, the correct legal standard.

E

Finally, the trial court's decision was not manifestly unreasonable because it did not fall "outside the range of acceptable choices, given the facts and the applicable legal standard." Littlefield, 133 Wn.2d at 47. In light of the evidence that was before the trial court when it made its ruling, a reasonable judge could have concluded that each of the five factors enumerated in Biggers weighed in favor of a determination that the photographic identification procedures at issue did not create a substantial likelihood of misidentification.[4]

---

[4] Finally, in light of all of the circumstances set forth above, we cannot say that "no reasonable judge would have ruled as the trial court did." Mason, 160 Wn.2d at 934.

For these reasons, the trial court did not abuse its discretion by denying Derri's motion to suppress the identifications made by Fletcher, Amdahl, and Hilen.

IV

Derri next contends that the trial court erred by denying his motion for either a mistrial or a dismissal (with regard to count three) pursuant to CrR 8.3(b)[5] and CrR 4.7(h)(7)(i).[6]  Specifically, Derri asserts that the trial court was required to either declare a mistrial with regard to count three or dismiss count three after witness testimony revealed that the State had failed to disclose the existence of the video from Ken's Market that depicted the exterior of HomeStreet Bank both immediately before and after the March 11 robbery.  We disagree.

"Two things must be shown before a court can require dismissal of charges under CrR 8.3(b)."  State v. Michielli, 132 Wn.2d 229, 239, 937 P.2d 587 (1997).  "First, a defendant must show arbitrary action or governmental misconduct."  Michielli, 132 Wn.2d at 239.  Second, a defendant must show "prejudice affecting the defendant's right to a fair trial."  Michielli, 132 Wn.2d at 240.

---

[5] Under CrR 8.3(b), a trial court "may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial."

[6] CrR 4.7(h)(7)(i) provides:
[I]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

Moreover, "[t]he purpose behind discovery disclosure is to protect against surprise that might prejudice the defense." State v. Barry, 184 Wn. App. 790, 796, 339 P.3d 200 (2014). "If the State fails to disclose such evidence or comply with a discovery order, a defendant's constitutional right to a fair trial may be violated; as a remedy, a trial court can grant a continuance, dismiss the action, or enter another appropriate order." Barry, 184 Wn. App. at 796 (citing CrR 4.7(h)(7)(i)).

A trial court's decision on a motion to dismiss under CrR 8.3(b) is reviewed for manifest abuse of discretion. State v. Moen, 150 Wn.2d 221, 226, 76 P.3d 721 (2003). Likewise, "[d]iscovery decisions based on CrR 4.7 are within the trial court's sound discretion." State v. Vance, 184 Wn. App. 902, 911, 339 P.3d 245 (2014).

During the trial, a police officer's testimony revealed that the State had failed to disclose a surveillance video from a business—Ken's Market—which was located across the street from HomeStreet Bank. The video depicted the scene outside of the bank both immediately before and after the March 11, 2017 robbery. The prosecutor was not aware of the video's existence. The prosecutor arranged for a detective to locate the video and, the next day, the prosecutor provided a copy of the video to Derri.

Derri moved for either a mistrial or a dismissal with regard to count three, which concerned the March 11 robbery of HomeStreet Bank. The motion was brought pursuant to CrR 8.3(b) and CrR 4.7(h)(7)(i). Derri advanced four arguments as to why he was prejudiced by the State's failure to timely disclose

the video: (1) he was unable to provide the video to an expert who may have been able to enhance the video, including the face and right index finger[7] of the suspect, (2) he was denied an opportunity to interview potential witnesses from the businesses that the suspect was seen passing, (3) he may have been able to determine whether there was further surveillance footage from a nearby automated teller machine (ATM) and neighboring businesses, and (4) he could have argued a different suspect theory based on the video.

Initially, the trial court offered a continuance or a recess as a remedy to address Derri's concerns. Derri declined these remedies. The trial court then determined that the State's failure to disclose the video constituted a discovery violation and governmental misconduct. However, the court denied the request for a mistrial or dismissal, reasoning that Derri had failed to establish prejudice.

The trial court did not abuse its discretion by denying Derri's request for a mistrial or dismissal with regard to count three. Indeed, the trial court explained that each of the reasons advanced by Derri as to why he was prejudiced were speculative:

> With regards to the first claim regarding possible expert testimony, the Court finds no actual prejudice has been shown. The Court finds that the video stills of the HomeStreet Bank robbery on March 11th, as taken within the bank branch, are good quality video stills that show the robber's face and whole body during the robbery. Accordingly, if the defendant wanted an expert to blow up the face and hands of the robbery suspect, they were free to use that video for the same purpose. They have not done so or they've not introduced evidence of such, and it is unlikely, or at the very least speculative, that the Ken's Supermarket video would have

---

[7] Because Derri had "tattoos on his right index finger," Derri's counsel argued that an expert may have been able to enhance the video footage in order to determine whether the individual featured in the video had such tattoos.

provided any different evidence than the HomeStreet Bank or even the Chase Bank videos of the other robbery.

In fact, the Court finds that the Ken's Supermarket video is of relatively poor quality, and what it captures of the suspect's face and hands is even less than what was captured inside the HomeStreet Bank. It is also farther away. And because of this, it is speculative to claim that the Ken's Supermarket video would be any more helpful in advancing the defense in this case.

With regard to the second and third claims of prejudice, which is the loss of an opportunity to interview businesses and obtain surveillance videos from neighboring businesses and ATM machines, the Court also finds that actual prejudice has not been shown. Defense has had the opportunity to do this type of an investigation even if the video had never been obtained at all.

Finally, with regard to the fourth claim of prejudice, which is that he could have advanced a different suspect theory based on the video evidence, the Court finds no actual prejudice. The video and stills from inside the HomeStreet Bank, like I said earlier, are better quality, and if defendant was unable to advance a different suspect theory with that evidence, it is beyond speculative that a surveillance video that is farther away and of poorer quality would further that defense.[8]

The trial court's decision was not manifestly unreasonable or based on untenable grounds or untenable reasons. Indeed, a reasonable judge could have determined that the video footage from Ken's Market was of poorer quality than the photographs that captured the scene inside the bank. Because of the relatively poor quality of the video footage from Ken's Market, the trial court reasonably determined that Derri's claims of prejudice were speculative. Moreover, the trial court reasonably concluded that Derri had an opportunity to obtain video footage from any ATM machine or business near HomeStreet Bank even if the State had never obtained the video footage from Ken's Market.

---

[8] Derri contends that, in denying his motion for a mistrial or dismissal, the trial court erroneously stated that a video of the March 11 robbery (rather than photographs) was admitted into evidence. Even if the trial court mistakenly believed that a video of the March 11 robbery was admitted into evidence, the court made clear that it found the photographs depicting the March 11 robbery to be of higher quality than the video from Ken's Market.

Accordingly, the trial court did not err.

V

Derri next contends that the trial court erred by refusing to instruct the jury on missing evidence. Specifically, Derri asserts that he was entitled to a missing evidence instruction because (1) the State did not retrieve video footage from HomeStreet Bank for any day in February, even though Amdahl informed a police officer after the March 7 robbery that she had recognized the robber as an individual with whom she had met in late February, (2) the State did not timely disclose the video footage from Ken's Market depicting the exterior of HomeStreet Bank both immediately before and immediately after the March 11 robbery, and (3) the State did not retrieve video footage of the March 11 robbery before it was deleted by HomeStreet Bank. We hold that Derri was not entitled to a missing evidence instruction.

The missing evidence instruction derives from the missing witness doctrine. Indeed, "[t]he rule is often referred to in a short-hand way as the 'missing witness' rule though the same inference may arise from the failure to produce other forms of evidence as well." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.8, at 291 (6th ed. 2016); see State v. James, 26 Wn. App. 522, 524, 614 P.2d 207 (1980) ("The range of sanctions available to the trial court is broad, including missing-evidence jury instructions.").

The missing evidence instruction is a permissive inference instruction that informs the jury that "'where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it,

and, . . . he fails to do so, — the jury may draw an inference that it would be unfavorable to him.'" State v. Blair, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991) (alteration in original) (quoting State v. Davis, 73 Wn.2d 271, 276, 438 P.2d 185 (1968), overruled on other grounds by State v. Abdulle, 174 Wn.2d 411, 275 P.3d 1113 (2012)).  The instruction is not warranted when the evidence is unimportant, merely cumulative, or when its absence is satisfactorily explained.  Blair, 117 Wn.2d at 489.

When a trial court refuses to issue a requested jury instruction, the standard of review "depends on whether the trial court's refusal . . . was based upon a matter of law or of fact."  State v. Walker, 136 Wn.2d 767, 771, 966 P.2d 883 (1998).  "A trial court's refusal to give instructions to a jury, if based on a factual dispute, is reviewable only for abuse of discretion."  Walker, 136 Wn.2d at 771-72.  "The trial court's refusal to give an instruction based upon a ruling of law is reviewed de novo."  Walker, 136 Wn.2d at 772.

We note that Derri requested several different jury instructions concerning missing evidence.  First, Derri requested the following jury instruction with regard to the State's failure to (1) obtain video footage from HomeStreet Bank depicting the events that transpired on February 24, 2017, and (2) timely disclose the video footage from Ken's Market depicting the exterior of HomeStreet Bank both immediately before and immediately after the March 11 robbery:

> If the State could have been [sic] introduced evidence at the trial and the State fails to introduce such evidence at trial, you may be able to infer that the evidence would have been unfavorable to the State.  You may draw this inference only if you find that:
> (1) The evidence was peculiarly available to the State or its agents;

(2) The issue on which evidence could have been presented is an issue of fundamental importance, rather than one that is trivial or insignificant;

(3) As a matter of reasonable probability, it appears naturally in the interest of the State to introduce that evidence;

(4) There is no satisfactory explanation of why the State did not introduce the evidence; and,

(5) The inference is reasonable in light of all the circumstances.[9]

The trial court refused to give this instruction, reasoning that the missing witness rule does not apply to evidence other than witnesses:

So the Court does not believe that this instruction is an accurate statement of the law as it pertains to evidence. Absent any case that suggests that the missing witness instruction is properly given in cases where the State could have obtained additional evidence but did not, they're just -- there is simply no case. So I'm not going to give the instruction. However, I will note you're free to argue that theory absent the instruction to the jury.[10]

---

[9] This proposed instruction was based on the pattern instruction entitled "FAILURE TO PRODUCE WITNESS":

If a person who could have been a witness at the trial is not called to testify, you may be able to infer that the person's testimony would have been unfavorable to a party in the case. You may draw this inference only if you find that:

(1) The witness is within the control of, or peculiarly available to, that party;

(2) The issue on which the person could have testified is an issue of fundamental importance, rather than one that is trivial or insignificant;

(3) As a matter of reasonable probability, it appears naturally in the interest of that party to call the person as a witness;

(4) There is no satisfactory explanation of why the party did not call the person as a witness; and

(5) The inference is reasonable in light of all the circumstances.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20 (4th ed. 2016) (WPIC).

Notably, the first prong from the instruction above states: "The witness *is* within the control of, or peculiarly available to, that party." WPIC 5.20 (emphasis added). Derri changed this language to: "The evidence *was* peculiarly available to the State or its agents." (Emphasis added.)

[10] It is worth noting that Derri's counsel, in fact, argued this theory extensively during closing argument:

So what are -- let's talk about some of the missing evidence in this case. Where is this video from 2/24? Where is it? You would think that as early as March 7th when Ms. Amdahl says, "The man came into the bank on February 24th," that the police would go pull this video to corroborate identification. They didn't bother to do that. Why not? What do they want you not to know about?

The trial court incorrectly reasoned that a missing evidence instruction can never be warranted. However, we may affirm the trial court's ruling "on any ground within the pleadings and proof." Michielli, 132 Wn.2d at 242. Because a missing evidence instruction was not warranted in this case, the trial court properly declined to issue the instruction.

Indeed, the video footage from late February was not missing. Detective Carver testified that he did not request from HomeStreet Bank any video footage from February 24, 2017. Moreover, the parties stipulated that "HomeStreet Bank's policy in 2017 was to retain surveillance video footage for 90 days." Thus, the evidence adduced at trial indicates that the video footage from late February was deleted by HomeStreet Bank—a non-state actor—pursuant to the bank's standard video-retention policy.

---

And they still could have gathered that video because . . . that video was still retained by HomeStreet Bank in that time period.

. . . You may have a whole other list of missing evidence, but this is the stuff that I came up with. This is not exhaustive. Where is this video from March 11? Why don't we have that video? You saw a video from Chase Bank, you saw a video from the other HomeStreet incident, why don't we have March 11th?

That evidence, this evidence, the 2/24 video, they could have gotten this stuff easily enough. They were the first ones on scene for these robberies. They were the first ones who had contact with the bank employees. That was available to the police. They could have requested it, they could have produced it, they could have played it. Why not?

And this video from 2/24 . . . and the March 11th video . . . go to an issue of fundamental importance. It goes to the issue of identification in this case. So you would expect the police to get that data, to get that information and present it to you. You would expect the State to present it to you in a trial like this. And it's routine for them to gather video in bank robberies. So it would have been natural for the detectives and investigators to [do] that, but they chose not to do it here. And there's no reason -- there's no explanation why they didn't do it? You didn't hear an explanation to the Court like why didn't you get this video? . . . They didn't explain to you why they chose to be sloppy in their investigation.

To be entitled to a missing evidence instruction, however, it must be that the evidence "'*is within the control* of the party whose interest it would naturally be to produce it.'" Blair, 117 Wn.2d at 485-86 (emphasis added) (quoting Davis, 73 Wn.2d at 276). The video footage from late February was not within the State's control because that footage was deleted by a non-state actor. To be entitled to a missing witness instruction, a party must demonstrate, among other things, that "the witness is peculiarly available to one of the parties." State v. Reed, 168 Wn. App. 553, 571, 278 P.3d 203 (2012). The same is true for claimed missing evidence. Derri was not entitled to a missing evidence instruction with regard to the video footage that was deleted pursuant to HomeStreet Bank's standard video-retention policy. The reason for its absence was adequately explained.

Furthermore, Derri was not entitled to a missing evidence instruction with regard to the video footage from Ken's Market. Indeed, the State provided Derri with a copy of this video footage during the trial. For a missing evidence instruction to have been warranted, however, Derri was required to establish that the State had failed to produce the evidence in question. See Blair, 117 Wn.2d at 486. It did not. Derri was free to present the video to the jury. Moreover, as the court pointed out in ruling on the motion for a mistrial, the Ken's Market video was of a lesser quality than the evidence the State chose to put before the jury. Thus, the "absence" of the video from the evidence presented at trial was adequately explained to, and understood by, the trial court.

Next, concerning the State's failure to obtain video footage depicting the March 11 robbery of HomeStreet Bank, Derri requested the following instruction:

> If you find that the State or its agents failed to obtain evidence that the State or its agents knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the State.

Derri also requested a related instruction, which provided: "A police officer is an agent of the State."

Derri claimed that he was entitled to these instructions because Detective Carver requested,[11] but did not obtain, video footage of the March 11 robbery before that footage was deleted by HomeStreet Bank pursuant to the bank's standard video-retention policy.[12] In support of his argument, Derri cited to a

---

[11] Although Derri asserted that Detective Carver "requested" the video footage of the March 11 robbery, the evidence adduced at trial does not clearly indicate whether Detective Carver requested this footage from HomeStreet Bank:

| [Defense Counsel]: | Now, one of your standard operating procedures is to request video from a bank that has been robbed, correct? |
|---|---|
| [Detective Carver]: | Generally, yes. |
| [Defense Counsel]: | And in this case, you did not request video from the HomeStreet robbery on March 11? |
| [Detective Carver]: | I didn't? |
| [Defense Counsel]: | Do you need to look at your report to refresh your memory about that? Just let me know if you do. |
| [Detective Carver]: | I don't recall if I requested video or not. They were robbed more than once. I do remember having conversations with their corporate security rep. |
| [Defense Counsel]: | But he didn't respond to the March 11th robbery? |
| [Detective Carver]: | No, I don't think so. |

[12] The record does not clearly indicate whether the video footage of the March 11 robbery was actually deleted by HomeStreet Bank pursuant to the bank's video retention policy, or whether the video footage never existed because of "technical difficulties" with HomeStreet Bank's surveillance cameras.

During the hearing on Derri's motion for a mistrial or a dismissal, the State represented to the trial court that HomeStreet Bank did not provide the State with video footage of the March 11 robbery because of "technical difficulties" with the footage:

THE COURT: . . . For the March 11th robbery, there are photo stills. And were those photo stills provided electronically to counsel?
[THE STATE]: Yes.
THE COURT: Okay. And I cannot recall if -- is that the way that their surveillance video works is just doing a still every few seconds?

32

federal appellate court's opinion in United States v. Sivilla, 714 F.3d 1168 (9th Cir. 2013).

The trial court denied Derri's proposed instruction, reasoning, among other things, that "Sivilla is distinguishable because it was a spoliation case." Indeed, the Sivilla court held that a defendant was entitled to a spoliation instruction because, in relevant part, "evidence was destroyed while in the government's custody." 714 F.3d at 1173.

In any event, Derri was not entitled to a remedial instruction with regard to the State's failure to obtain video footage depicting the March 11 robbery of HomeStreet Bank. The evidence adduced at trial indicates that the video footage of the March 11 robbery was deleted by HomeStreet Bank—a non-state actor— pursuant to the bank's standard video-retention policy. As with the video footage from late February, the video footage depicting the March 11 robbery was not

---

[THE STATE]: Is Your Honor asking about inside the bank?
THE COURT: Correct.
[THE STATE]: No. No. It's my understanding that the bank had difficulty providing the video from the 11th, which is why we don't actually have a surveillance video, technical difficulties with the video itself, which is why we have stills and not a video.

However, the trial court subsequently read the following stipulation to the jury:

The parties agree that the following specified facts are true and admissible. HomeStreet Bank's policy in 2017 was to retain surveillance video footage for 90 days. That policy applied to all cameras. All cameras recorded 24 hours a day in February and March of 2017. Only two cameras had issues from that timeframe. On March 30th, 2017, camera number three was not working, and on March 9th, 2017, there was a brief branch outage while new hard drives were added to [the] DVR. Both issues were resolved within a day.

Because the parties stipulated that "[o]nly two cameras had issues" between "February and March of 2017," and that those issues occurred on March 9 and March 30, 2017, and were each "resolved within a day," we assume that the video footage of the March 11 robbery was deleted by HomeStreet Bank pursuant to the bank's video-retention policy.

missing. It did not exist. Thus, Derri was not entitled to a missing evidence instruction.[13]

Accordingly, the trial court did not err.

VI

Derri next contends that resentencing is required because the State failed to prove his identity concerning the prior convictions that comprised his offender score at sentencing. We disagree.

The State bears the burden of proving a defendant's criminal history by a preponderance of the evidence. State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019). To establish a prior conviction, "there must be some showing that the defendant before the court for sentencing and the person named in the prior conviction are the same person." State v. Ammons, 105 Wn.2d 175, 190, 713 P.2d 719, 718 P.2d 796 (1986). "[T]he identity of names is sufficient proof, which may be rebutted by the defendant's declaration under oath that he is not the same person named in the prior conviction." Ammons, 105 Wn.2d at 190. Indeed, "[t]he defendant's declaration under oath will suspend the use of the prior conviction in assessing the presumptive standard sentence range until the State proves by independent evidence . . . that the defendant before the court for sentencing and named in the prior conviction are the same." Ammons, 105 Wn.2d at 190.

---

[13] Neither was Derri entitled to a spoliation instruction. Indeed, Washington law regarding spoliation provides that "for a direct sanction to apply the spoliation must in some way be connected to the party against whom the sanction is directed." Henderson v. Tyrrell, 80 Wn. App. 592, 606, 910 P.2d 522 (1996). Because the video footage of the March 11 robbery was deleted by employees of HomeStreet Bank—a non-state actor—pursuant to the bank's standard video retention policy, the deletion of the footage was not connected to the State.

Here, the State established identity of names.[14]  Derri was charged as "Christopher Lee Derri, aka John Stites."  All of the certified documents submitted by the State contained the name "Christopher Lee Derri," "Christopher L. Derri," "Christopher Derri," "John Stites," "John T. Stites," or "John Timothy Stites."[15]  These names are sufficient to establish identity of names.  See, e.g., State v. Powell, 172 Wn. App. 455, 458-59, 290 P.3d 353 (2012) (holding that the State established identity of names where a defendant was charged as "Larry Allen Powell" and was previously convicted as "Larry A. Powell").

---

[14] Although the State established identity of names, Derri correctly points out that the State did not offer a certified document for one prior conviction on which the sentencing court relied: a juvenile conviction from 1997 for possession of a controlled substance with the cause number 97-8-00311-5.  This conviction added a half point to Derri's offender score.  Without this conviction, Derri's offender score would have been 16 instead of 17.  Because Derri's sentencing range was a "9+," the standard range sentence would have been the same regardless of whether Derri's score was 16 or 17.  Thus, the error is harmless.  See State v. Argo, 81 Wn. App. 552, 569, 915 P.2d 1103 (1996) (holding that an error in calculating an offender score was harmless because the standard range sentence would have been the same under the proper score).

[15] The certified documents filed by the State included: (1) a judgment and sentence for one count of possession of methamphetamine and one count of possession of stolen property third degree wherein the defendant is identified as "John T. Stites"; (2) a judgment and sentence for one count of assault in the second degree - domestic violence wherein the defendant is identified as "Christopher Lee Derri AKA: John Stitos" as well as an information related to that count wherein the defendant is identified as "Christopher Lee Derri AKA John T. Stites"; (3) a judgment and sentence for one count of conspiracy to commit a violation of the Uniform Controlled Substances Act: possess methamphetamine wherein the defendant is identified as "Christopher Lee Derri"; (4) a juvenile court judgment for one count of assault in the third degree and one count of escape in the second degree wherein the defendant is identified as "John Timothy Stites"; (5) a juvenile court judgment for one count of unlawful possession of a firearm in the first degree and one count of violation of Uniform Controlled Substances Act - possession of methamphetamine wherein the defendant is identified as "John Timothy Stites"; (6) a juvenile court judgment for one count of robbery in the second degree wherein the defendant is identified as "John Timothy Stites"; (7) a juvenile court order of disposition for one count of attempted possession of a controlled substance wherein the defendant is identified as "John Stites"; (8) a juvenile court order of disposition for one count of escape in the first degree wherein the defendant is identified as "John Stites"; (9) a juvenile court order of disposition for one count of taking a motor vehicle without the owner's permission wherein the defendant is identified as "John Stites"; (10) a federal court judgment for two counts of felon in possession of a firearm wherein the defendant is identified as "John Timothy Stits" as well as a guilty plea related to those counts wherein the defendant is identified as "John Timothy Stites"; and (11) a judgment and sentence from an Oregon state court for one count of tampering with a witness wherein the defendant is identified as "John Timothy Stites."

Derri asserts that the State was required to present evidence in addition to the certified documents because his defense counsel objected to the certified documents filed by the State on the ground that the documents contained numerous "aliases and different birthdays." Not so. As already explained, the State established identity of names. The State was not required to establish identity of birthdates in order to meet its burden of proof. See Ammons, 105 Wn.2d at 190. Had Derri desired the State to have been required to submit further evidence of his criminal history, he could have made a "declaration under oath that he is not the same person named in the prior conviction[s]." Ammons, 105 Wn.2d at 190. He did not do so.

Accordingly, Derri is not entitled to a new sentencing hearing on this basis. Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____
Mann, C.J.

36

State v. Derri, No. 80396-4-I

COBURN, J. (concurring) — I agree with the majority that under the totality of the circumstances, the photo identification procedures used by law enforcement did not create a substantial likelihood of irreparable misidentification. Thus, I concur with the majority that the trial court did not err by admitting evidence of the out-of-court and in-court identifications of Derri. I also concur with the majority's resolution of the remaining issues it resolves. I write separately because I would hold that Derri met his burden to show the photo identification procedures used in this case were impermissibly suggestive in that Derri was the only person with a neck tattoo in the montages presented to witnesses.

## DISCUSSION

The due process clause protects against the admission of evidence derived from improper identification procedures. Neil v. Biggers, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); U.S. CONST. amend. XIV.[16] "To establish a due process violation, a defendant must first show that an identification procedure is suggestive." State v. Linares, 98 Wn. App. 397, 401, 989 P.2d 591 (1999). "A 'lineup of clones is not required.' " United States v. Johnson, 745 F.3d 227, 230 (7th Cir. 2014) (quoting United States v. Arrington, 159 F.3d 1069, 1073 (7th Cir. 1998)). Nevertheless, a procedure is suggestive if

---

[16] Derri also cites to article I, section 3 of the Washington State Constitution in support of his due process argument. But he does not separately analyze his state constitutional argument, and thus, neither do I.

it directs undue attention to the defendant. State v. Eacret, 94 Wn. App. 282, 283, 971 P.2d 109 (1999).

We have held that the trial court's ultimate decision whether to admit evidence of a photo identification is reviewed for abuse of discretion. State v. Kinard, 109 Wn. App. 428, 435, 36 P.3d 573 (2001). However, whether a photo montage is impermissibly suggestive, so as to warrant consideration of the Biggers factors, is a conclusion of law we review de novo based on an independent review of the montage. See State v. Vickers, 107 Wn. App. 960, 968, 29 P.3d 752 (2001) (conducting independent review of montage and concluding it was not impermissibly suggestive), aff'd, 148 Wn.2d 91, 59 P.3d 58 (2002); Eacret, 94 Wn. App. at 285 (conducting independent review of montage to determine whether anything in it unduly attracted attention to defendant's photo); see also United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987) ("Whether a pretrial identification procedure is impermissibly suggestive is reviewed de novo.").

Here, each of the witnesses who positively identified Derri was shown a montage of photos of six or seven males of apparently similar age and race. Derri bears a clearly visible neck tattoo in his photo, and he is the *only* person in the montage bearing a visible tattoo. The trial court concluded the montage was not impermissibly suggestive because "no witness described the bank robber as having a tattoo, and therefore, there was no obligation on the part of police to provide another photograph of individuals with tattoos." The trial court was wrong.

38

Detective Carver created the montage knowing that the suspect was Derri and that he was the only individual with a visible neck tattoo in the montage. Carver could easily have cut off the photos below the chin or created a montage where everyone had a neck tattoo. Instead, he chose to create a montage where the suspect visibly stood out from the others.

I would hold that this distinctive difference directed undue attention to Derri and, thus, rendered the identification procedure impermissibly suggestive. See State v. Burrell, 28 Wn. App. 606, 610-11, 625 P.2d 726 (1981) (holding that photo montage was impermissibly suggestive where defendants' photo was "a closer view than the others, which might have tended to call attention to his photo," and "[n]one of the other individuals had a 'frizzy Afro' hairstyle as long as [the defendant]'s."); cf. United States v. Whitewater, 879 F.3d 289, 292 (8th Cir. 2018) (holding that lineup was not impermissibly suggestive where all individuals were dark or olive-skinned individual males with very short black hair between 20 and 50 years of age and *all* had neck tattoos).

Relying on Vickers, the State contends that "[t]he presence of a particular feature not present in other photos does not necessarily mean the montage was impermissibly suggestive." In Vickers, the only differences were that the defendant's photo had a lighter background, and the defendant was the only person in the montage not wearing coveralls. 148 Wn.2d at 118. Our Supreme Court held "[t]hese minor differences are not sufficient to warrant further inquiry," observing, "The lighter background . . . does not unduly draw attention . . . , nor do the photographs show enough clothing to draw attention." Id. at 119. Here,

the clearly visible tattoo on Derri's neck *does* draw attention. The State's reliance on Vickers is misplaced. Cf. United States v. Kelsey, 917 F.3d 740, 750 (D.C. Cir. 2019) (holding that photo array was not impermissibly suggestive even though defendant was the only person with a tattoo because the tattoo was not clearly discernable in photo, but observing, "Of course, if only one photo in a photo array has a characteristic distinctive to the defendant, then the array may well be impermissibly suggestive.").

The State also points out that Fletcher once and Price twice failed to make any selection despite Derri's being the only person pictured with a neck tattoo. The State contends that this means the tattoo was not impermissibly suggestive. But as to Price, the State cites no authority for the proposition that a "no pick" by a witness other than the one whose identification is challenged negates a conclusion of impermissible suggestiveness. And as to Fletcher, even the State acknowledges that Derri's tattoo was barely visible in the first photo montage shown to Fletcher. That Fletcher did not select anyone from that photo montage but later selected Derri from the second montage in which Derri's tattoo was clearly visible weighs in *favor of*, not against, a conclusion that the second montage was impermissibly suggestive.

Finally, the State argues that the presence of the tattoo was not impermissibly suggestive because no witness described the robber as having a neck tattoo. It relies on Burrell in support of the proposition that the presence of a distinctive feature is "less suggestive when the particular feature is not mentioned by the witness in their description of the perpetrator." That was not

40

the holding in Burrell. In Burrell, we held that a photo montage was impermissibly suggestive where the defendant was the only person pictured with the "particular and somewhat distinctive characteristic" of a " 'frizzy Afro' " hairstyle. 28 Wn. App. at 610. In so doing, we did observe that one witness's description of the perpetrator referred to that hairstyle and thus, "the risk that a misidentification will occur based solely or primarily upon that characteristic is substantially *enhanced.*" Id. at 611 (emphasis added). We did not hold, however, that an identification procedure is impermissibly suggestive *only if* a witness mentioned the distinctive feature that is unique to the defendant's photograph. To the contrary, we held the identification procedure in Burrell was impermissibly suggestive as to *both* of two witnesses despite the fact that only *one* of them had described the perpetrator as having "an 'Afro' hairstyle." Id. at 607.

The State's reading of Burrell and the trial court's apparent agreement with that reading dangerously suggest that distinct differences between photos in a montage are permissible as long as no witness identified the suspect by that distinguishing feature. That contradicts more than 50 years of case law. The United States Supreme Court in Simmons v. United States, 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), explained:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This

41

danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, *or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.*

(Emphasis added.)

It is beyond dispute that eyewitness misidentification plays a role in wrongful convictions and that developing neuroscience behind memory raises legitimate questions about the weight factfinders should give to eyewitness confidence levels in the reliability of their identifications. See State v. Scabbyrobe, No. 37124-7-III, slip op. at 20-26 (Wash. Ct. App. Mar. 18, 2021), http://www.courts.wa.gov/opinions/pdf/371247_pub.pdf (Fearing, J., dissenting). Carver's compilation of the photo montage, and the trial court's conclusion that the montage was not impermissibly suggestive, are steps backward in the continuing quest to avoid wrongful convictions.

With these considerations in mind, I respectfully concur.

_____
Coburn, J.