IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82321-3 |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SAMUEL DAVID VOEGELE, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, C.J. — Samuel Voegele appeals his conviction for first degree arson. Voegele contends the court erred by admitting an out-of-court single photo identification, admitting text messages without proper authentication, and admitting hearsay from a law enforcement database. We affirm.

FACTS

On May 31, 2020, when Eric DeLeon[1] walked out of his house located at 559 East Axton Road in Whatcom County, he saw a truck pull into his driveway. A stranger, a large man with tattoos, jumped out of the truck carrying a bat or bar in his hand. The man seemed "super pissed" and told DeLeon that he was looking for Kyle Riddle, who lived in a travel trailer next to DeLeon's home, because Riddle owed him money. Two other cars

---

[1] The record provides two different spellings for the last name of eyewitness Eric DeLeon (both Deleon and DeLeon). For the purposes of this appeal, we will follow the State's lead and use DeLeon. We mean no disrespect if this is an incorrect spelling of his last name.

Citations and pin cites are based on the Westlaw online version of the cited material.

pulled up behind the truck—a green Volkswagen Beetle and a Honda, with three additional people inside. Tarah Mendoza was driving the green Volkswagen; Samuel Voegele sat in her passenger seat. The group stood around Riddle's trailer and one of the women stated she was going to burn the place down. The larger man also said he was going to "connect [his truck] to the trailer and burn it down." DeLeon saw that they had gas and "they had everything like they were going to [do] no matter what, prepared to already do what they were going to do." DeLeon, who had friends with him, asked the driver of the truck to move his vehicle out of the way so he could leave with his friends. When he departed, Mendoza, Voegele and the tattooed man remained behind. Although the truck driver was threatening to remove the trailer and leave, he had not done so by the time DeLeon left. DeLeon tried to call Riddle to tell him what was happening.

Around 7 p.m. that same evening, John Nymoen, who lives at 641 East Axton Road, looked out his window and saw three vehicles, a silver Acura, a green Volkswagen Beetle, and a truck pulling a trailer, park at the entrance to a gravel pit across the road from Nymoen's house. He saw six individuals hanging out and walking in and out of the trailer, and he assumed they were getting ready to party. Nymoen saw Voegele splashing liquid onto the trailer as he ran around it. Five to ten minutes later, when he heard wheels squealing on the gravel, he looked out his window again and saw the truck disconnected from the trailer and the trailer on fire. Nymoen crossed the road to confront the group, called 911, and took photos as they fled in their cars. One of his photos captured the green Volkswagen's license plate, leading police to Mendoza, its registered owner.

The police responded to Nymoen's call and found the trailer completely destroyed. From its license plate, they traced the trailer to Riddle and to DeLeon's address.

Whatcom County Deputy Sheriff Mason Stafford drove from the burned trailer to DeLeon's address to talk to DeLeon. DeLeon identified the individuals who had threatened to steal and burn Riddle's trailer. He described the two men—one was heavy set, weighing 280 to 300 pounds, with "tons of tattoos," and the other was a smaller white man with blonde hair and no tattoos.

Deputy Stafford then contacted Riddle to inform him that his trailer had been removed from the property and burned down. Riddle met Deputy Stafford at the scene of the arson and denied knowing who would want to destroy his home. But after Riddle left the scene, he called Deputy Stafford and told him that Mendoza had been there with someone named Sam. Riddle later forwarded Deputy Stafford copies of text messages, purported to be messages from Sam, which indicated Mendoza's intent to burn Riddle's trailer down.

Riddle testified the messages were screenshots of a text conversation he had with Sam Voegele. Riddle used a friend's phone, and a phone number sent from another friend, to text Voegele at (360) 319-0968. The first message Riddle sent at 6:25 p.m. that day stated, "I robbed Kyle," "[a]nd stabbed him . . . on his way to the emergency room so leave me alone." Voegele responded with a message making it clear he did not believe the sender had robbed Riddle. At 6:35 p.m., Voegele texted "[w]ell[,] [I] guess [T]arah is going to burn his house down[.] [N]ot my deal I guess." A subsequent text message from Voegele, with a time stamp of 12:16 p.m., stated "I apologize for what she did I guess I was there and saw it happen but I'm just [s]aying ur homie said u planned to RIP her off the whole entire thing was planned from the very beginning." Riddle identified the messages as accurate representations of messages he received from Voegele on his

friend's phone. He identified Voegele, whom he pointed out in the courtroom, as the sender of the texts.

Deputy Stafford provided a copy of the text messages, with the sender's phone number clearly visible, to Ann Bjertness, records and IT manager for Whatcom County Sheriff's Office. She testified that, as part of her job, she uses a database, known as the Spillman database, an investigatory tool used by law enforcement agencies, to link an individual's name with an address, phone number, and other information law enforcement may add. When Bjertness searched the database using the phone number on Riddle's text messages, she learned that the phone number was linked to Voegele.

Once Deputy Stafford had Voegele's full name, he contacted DeLeon and asked if he would look at a photo montage to identify the men who took Riddle's trailer. DeLeon refused to look at a photo montage but agreed to look at a single photograph. Deputy Stafford showed DeLeon a photograph of Voegele and DeLeon positively identified him as the blonde man who had been on his property with Mendoza. At trial, DeLeon confirmed that he saw Voegele on his property before the trailer was removed and burned.

A jury found Voegele guilty of first degree arson. Voegele appeals his conviction.

ANALYSIS

1. DeLeon's Photo Identification and In-Court Identification

Voegele first contends the trial court violated his due process rights by admitting DeLeon's out-of-court and in-court identifications of Voegele, arguing the single photo identification process that Deputy Stafford used was impermissibly suggestive and created a substantial likelihood of misidentification. We disagree.

After a CrR 3.6 hearing, during which the trial court heard testimony from DeLeon and Deputy Stafford, it held that DeLeon's identification was admissible. The trial court found that while "a single photograph may present a danger of suggestibility for the purposes of identification, it is clear, based on the testimony, that Mr. [DeLeon] would only agree to look at a single photograph and that there was no active effort by law enforcement to manipulate [DeLeon] into making an identification." The court further found that

> on the date of the charged crime, he witnessed a blonde male, whom he would later positively identify as Defendant, arrive at the scene with a group of associates[,] . . . he spoke with Defendant and associates for a significant period of time, approximately 15 to 20 minutes[,] . . . his conversation was primarily not with Defendant, but that he did speak with Defendant at some point [,] . . . he thought the Defendant could be his friend in the future[, and] . . . he thought he was about 15 feet away from the trailer during this conversation.

The court also found that DeLeon "[was] strong in his memory that [Voegele] was the person he had seen." Lastly, the court found that DeLeon was able to reliably observe Voegele because "only two males were present in [the] group that Mr. [DeLeon] spoke with[, one of those being] . . . a larger man who was not Defendant, and the other was a blonde male." The trial court was convinced that DeLeon's identification was "clearly based on his memory and his own observation and his own personal knowledge," and not the result of any suggestibility in the identification process.

We review a trial court's decision to admit identification evidence for abuse of discretion. State v. Kinard, 109 Wn. App. 428, 432, 36 P.3d 573 (2001). A trial court abuses its discretion only if (1) the decision is manifestly unreasonable, i.e., it falls outside the range of acceptable choices, given the facts and the applicable legal standard, (2) the decision is based on untenable grounds, i.e., the factual findings are unsupported by the

record, or (3) the decision is based on untenable reasons, i.e., it is based on an incorrect standard or the facts are insufficient to meet the requirements of the correct standard. State v. Derri, 17 Wn. App. 2d 376, 392, 486 P.3d 901, review granted in part, 198 Wn.2d 1017 (2021).  This court treats unchallenged findings of fact as verities on appeal and reviews conclusions of law regarding suppression of evidence de novo.  State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006).

The validity of an identification procedure is generally a question of fact for the jury and the identification becomes inadmissible only when its reliability is so questionable that it cannot offset the suggestiveness of the procedure used to make the identification. State v. Hanson, 46 Wn. App. 656, 664, 731 P.2d 1140 (1987).  An out-of-court photo identification violates due process if it is so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.  State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002).  To establish a violation, Voegele bears the burden of showing that the identification procedure was suggestive.  Id.  If he fails, the inquiry ends.  Id.  If he proves the procedure is suggestive, then the court considers, based on the totality of the circumstances, whether the procedure created a substantial likelihood of irreparable misidentification.  Id.

To decide if such a risk exists, a court should consider: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the identification.  Derri, 17 Wn. App. 2d at 393 (citing Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)).

Voegele does not assign error to any of the trial court's findings of fact. Nor does he contend the trial court based its decision on an incorrect legal standard. He appears to argue only that the facts here were sufficient to prove that Deputy Stafford's single photo identification procedure was impermissibly suggestive and tainted both the out-of-court and in-court identification.

Because the trial court properly exercised its discretion in concluding that the identification procedure did not create a substantial likelihood of misidentification under the Biggers factors, we need not decide whether the single photo procedure was impermissibly suggestive. First, DeLeon had an opportunity to speak with Voegele at the time Voegele was on his property. The record supports the trial court's findings that DeLeon spoke with Voegele and his acquaintances for about 15 to 20 minutes while standing about 15 feet from the trailer. Second, even though DeLeon's conversation with Voegele was brief, the record supports the trial court's finding that the interaction was sufficient to lead DeLeon to form an opinion of Voegele as friendly and to believe they could be friends in the future.

Third, the record also supports the trial court's finding that DeLeon's identification of Voegele before seeing his photograph was consistent with Voegele's appearance in the photograph. Fourth, DeLeon showed a high level of certainty when he saw Voegele's photograph. DeLeon testified that the person in the photo was "definitely" the person he had seen that day.

Finally, the amount of time that elapsed between the time DeLeon saw Voegele on his property and the time he described Voegele's physical appearance and then

viewed the photograph was relatively short.  The witnesses testified and the trial court found that DeLeon's photo identification occurred the same day as the crime.

Additionally, the trial court found Deputy Stafford had not manipulated DeLeon into identifying Voegele as the person he saw that day.  In Perry v. New Hampshire, 565 U.S. 228, 241, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), the Supreme Court noted that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."  Here, Deputy Stafford went to DeLeon's residence with the intention of showing him six different photos for the identification.  Only after DeLeon refused to look at more than one photo did Deputy Stafford ask him to look at a single photo.

The trial court properly analyzed this relevant evidence and reached a reasonable conclusion based on the correct legal standard.[2]  Derri, 17 Wn. App. 2d at 399.  The trial court's decision to admit the out-of-court identification did not violate Voegele's due process rights or taint DeLeon's subsequent in-court identification.

## 2. Text Messages

Voegele next contends the trial court improperly admitted the text messages because the State failed to properly authenticate the messages as having come from Voegele.

---

[2] Voegele suggests a single photo identification procedure is always impermissibly suggestive and a violation of due process.  We disagree.  In Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), the U.S. Supreme Court rejected this argument.  The court stated that a single photo identification procedure, even if suggestive, would not be unconstitutional if it did not create a substantial likelihood of irreparable misidentification under the Biggers factors.  Id. at 116.

This court reviews a trial court's admission of evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). Under ER 901(a) "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Rule 901 does not limit the type of evidence allowed to authenticate a document. It merely requires some evidence which is sufficient to support a finding that the evidence in question is what [its] proponent claims it to be." State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007) (quoting United States v. Jimenez Lopez, 873 F.2d 769, 772 (5th Cir. 1989)). ER 901(b)(1) provides that authentication is satisfied with testimony from someone with personal knowledge that the evidence is what the State claims it to be.[3] Kinard, 109 Wn. App. at 436.

In this case, Riddle, the person who received the text messages, testified that the messages were part of a conversation he had with Voegele. This testimony suffices to authenticate the texts under ER 901(b)(1).

Additionally, the content of the messages corroborated Riddle's testimony. The texts talked about "Kyle," arguably a reference to the victim here, and "Tarah," the name of the registered owner of the green Volkswagen photographed near the burning trailer. The messages referred to Tarah's intent to burn down Riddle's trailer—information consistent with DeLeon's testimony. The second message string explicitly stated that the

---

[3] Voegele contends that there is a heightened level of scrutiny for authenticating text messages, as compared to other documents, under ER 901. He cites no authority for that proposition. We have consistently applied the same ER 901 test to text messages. See State v. Bradford, 175 Wn. App. 912, 928-29, 308 P.3d 736 (2013) (timing and content of texts indicated defendant sent them to victim and were admissible under ER 901); In re Det. of H.N., 188 Wn. App. 744, 759, 355 P.3d 294 (2015) (text messages admissible under ER 901(b)(10) because date, time, the sender's name and phone number, and content of messages provided circumstantial evidence that the statements were made by H.N.); and State v. Young, 192 Wn. App. 850, 369 P.3d 205 (2016) (witness with personal knowledge authenticated sender's phone number and testified the messages came from defendant, making the texts admissible under ER 901(b)(1)).

sender had been present "and saw it happen." The content was consistent with eyewitness testimony placing Voegele at the scene with Tarah Mendoza.

Additionally, one of the messages refers to "Eric," arguably a reference to Eric DeLeon who resided on the same property as Riddle and who spoke to Voegele shortly before the trailer fire. Finally, the timing of the text messages matches the events of that day. The first text message, stating that Mendoza was going to "burn his house down," was sent to Riddle at 6:35 p.m. The fire started around 7 p.m. This evidence supports the trial court's conclusion that the texts were properly authenticated under ER 901(b)(10).

Even if the trial court abused its discretion in admitting the text messages, any error stemming from that decision was harmless. To determine whether a trial court's abuse of discretion warrants reversal, the court applies a nonconstitutional harmless error standard. State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). "Where the error is not of constitutional magnitude, we apply the rule that the 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" Id. (quoting State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)).

While Voegele contends the text messages were key to the State's case, the text messages did not prove Voegele set the fire. To the contrary, the messages indicated that Mendoza, not Voegele, set the fire. The messages placed Voegele at DeLeon's property immediately preceding the fire, and three eyewitnesses also placed Voegele there that day. DeLeon stated he saw a group of people, including Voegele, on his property that day. Nymoen stated he saw a blonde man, whom he later identified as

Voegele, rummaging through Riddle's trailer while splashing a clear container of liquid. And Voegele called Mendoza to testify in his case. She, too, confirmed that she and Voegele were at Riddle's trailer on May 31, 2020. Based on the evidence, this court cannot say that there is a reasonable probability the outcome of the trial would have been different had the text messages been excluded. Any error in admitting the text messages was harmless.

### 3. Spillman Database

Voegele next contends the trial court erred in admitting evidence that the Spillman database linked his name with the phone number listed on the text messages. Voegele argues this information was inadmissible hearsay.

We review whether a statement was hearsay de novo. State v. Heutink, 12 Wn. App. 2d 336, 356, 458 P.3d 796 (2020). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible unless a court rule or statute allows it. ER 802. RCW 5.45.020 provides one such exception:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

This statute does not require proof of who actually made the record. State v. Iverson, 126 Wn. App. 329, 337, 108 P.3d 799 (2005). In general, the testimony of a records custodian will be sufficient to properly introduce the record. Id. at 338.

"The trial judge's decision to admit or exclude business records is given great weight and will not be reversed unless there has been a manifest abuse of discretion."

State v. Ziegler, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). A trial court manifestly abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or for untenable reasons. State v. Sanders, 86 Wn. App. 466, 469, 937 P.2d 193 (1997).

This court has held that some police records may qualify as business records under RCW 5.45.020. See Iverson, 126 Wn. App. at 339 (victim jail booking record constituted business record to prove identity of victim named in protection order); State v. Bradley, 17 Wn. App. 916, 918, 567 P.2d 650 (1977) (police computer printout recording all police calls requesting police assistance admissible as business record); State v. Bellerouche, 129 Wn. App. 912, 914, 120 P.3d 971 (2005) (trespass notice issued by police constituted admissible business record). But not all law enforcement databases fall within the statutory exception to the hearsay rule.

In In The Matter of the Detention of Coe, 175 Wn.2d 482, 502, 286 P.3d 29 (2012), our Supreme Court held that data in law enforcement investigative database, maintained to gather information about sexual assaults, contained inadmissible hearsay. In that case, the State offered information from the database for the purpose of proving the identity of the perpetrator of several allegedly "signature" sexual assaults. Coe, 175 Wn.2d at 488. The State argued the information about past crimes, deemed by the State to be similar to crimes of conviction, was admissible under the business record exception. Id. at 504-505. The Supreme Court disagreed. Id. at 505. "The business record exception generally applies to objective records of a regularly recorded activity and not those 'reflecting the exercise of skill, judgment, and discretion.'" Id. (quoting 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.37 (5th ed. 2007)). The information on which the database relied included police reports containing

subjective summaries of officers' investigations and victims' statements. Id. at 505. It held the database contained inadmissible hearsay. Id. at 505-506.

The State, however, argues that the Spillman database is more like the report deemed admissible in State v. Hines, 87 Wn. App. 98, 941 P.2d 9 (1997). In that case, the trial court admitted a jail record containing the defendant's social security number, phone number, date, address, height, and weight for the purpose of proving the identity of the defendant as the person arrested in Montana after absconding from the state with her child. Hines, 87 Wn. App. at 101. This court affirmed, reasoning that the jail record was a routine booking sheet with basic and objective information about the defendant, "the routine kind of record contemplated by RCW 5.44.040 [the public records exception to hearsay]." Id.

The name and phone number that the State obtained from the Spillman database is not exactly analogous to either the inadmissible subjective impressions of a police officer at issue in Coe or the admissible jail booking record at issue in Hines. Like the database in Coe, the Spillman database is an investigatory tool used by law enforcement agencies. According to the records custodian, the sheriff's office maintains the names and contact numbers of every person with whom the agency has had contact for the last seven years. Although the records custodian verified that the phone number linked to Voegele was entered into the system in 2016, she did not testify as to who collected or provided the data or how the connection between the phone number and Voegele was made. We thus do not know if the information came from Voegele himself, by virtue of a prior arrest, jail booking, or conviction, which would make the information admissible

-13-

under Hines, or if the information came from a third party, such as a victim, which would make the information more analogous to the inadmissible victim statements in Coe.

We need not resolve this issue, however, because we are convinced that admitting the evidence, even if based on an insufficient record, was harmless. The State used the evidence to connect the phone number identified on the text messages to Voegele. But the Spillman database was not the only evidence making this connection. Riddle testified he received those text messages from Voegele, that he got that phone number from a friend, and that he believed he was texting Voegele. Given that there was independent testimony connecting the phone number to Voegele and those text messages merely placed Voegele at the trailer and did not directly prove he committed the arson, there is no reasonable possibility that the Spillman database evidence affected the trial outcome.

### 4. Statement of Additional Grounds

Finally, Voegele contends that, according to his public defender, his trial should not have occurred when it did because all trials were supposed to be suspended due to COVID-19. Voegele appears to suggest that the trial court violated some order or law by holding his trial when it did.

While Whatcom County paused jury trials until November 16, 2020, this pause pertained only to trials with twelve person juries. See Whatcom County Superior Court Fourteenth Administrative Order (October 16, 2020).[4] If parties stipulated to a jury of six to eight jurors, superior courts were allowed to conduct trials before November 16, 2020. See Whatcom County Superior Court Twelfth Administrative Order (August 11, 2020)[5] (stating "will likely permit the Court to conduct jury trials with six to eight jurors. Litigants

---

[4] https://www.whatcomcounty.us/DocumentCenter/View/51347/14th-Administrative-Order
[5] https://www.whatcomcounty.us/DocumentCenter/View/49665/Twelfth-Admin-Order

-14-

who wish to consider this alternative should contact the Court's administrator for further information"). Voegele waived his right to a twelve-person jury and proceeded with a six-person jury. He made this request to expedite his trial. Given that Voegele requested a six-person jury, the court granted this request, and his trial was authorized by superior court administrative orders, we see no error here or any error that was not of his own making. See State v. Rushworth, 12 Wn. App. 2d 466, 477, 458 P.3d 1192 (2020) (invited error doctrine prohibits party from setting up error in the trial court and then complaining of it on appeal).

Affirmed.

Andrus, C.J.

WE CONCUR:

Bummer, J

Dwyer, J.