

**COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No.    37714-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | ORDER DENYING MOTION |
| | ) | FOR RECONSIDERATION AND |
| RAYMUNDO CASARES, | ) | AMENDING COURT'S |
| | ) | OPINION FILED JUNE 13, 2023 |
| Appellant. | ) | |

THE COURT has considered the appellant's motion for reconsideration of the opinion, the record and file herein, and is of the opinion the motion should be denied. Therefore,

IT IS ORDERED, the motion for reconsideration of this Court's decision of June 13, 2023 is hereby denied.

IT IS FURTHER ORDERED the opinion filed June 13, 2023, is amended as follows:

On page 20, the second paragraph that reads:

As to the timing of the identifications, Jorge identified Casares in the photo lineup five days after the shooting, and Rosales identified Casares two days after the shooting. In *Derri*, the court determined that an identification nine days after the incident weighed neither for nor against reliability noting that misidentifications substantially increase from 2 to 24 hours after an event. *Id.* at 689. Here, although it was still outside the 24-hour range, the time frame was significantly shorter, especially in the case of Rosales. Thus, this factor weighs slightly in favor of reliability.

shall be corrected to read:

As to the timing of the identifications, Jorge identified Casares in the photo lineup five days after the shooting, and Rosales identified Casares two days after the shooting. In *Derri*, the court determined that an identification nine days after the incident weighed neither for nor against reliability, noting that misidentifications substantially increase from 2 to 24 hours after an event. *Id*. at 689. While researchers have not pinpointed a precise time at which memory becomes unreliable, this temporal factor loses its value as time passes. *Id*. Here, the identifications were made within a significantly shorter time frame than those in *Derri*, especially in the case of Rosales. Nevertheless, since the identifications were made more than 24 hours after the crime, the factor is considered neutral in determining reliability.

The rest of the opinion shall remain as written.

PANEL: Judges Staab, Fearing, Pennell

FOR THE COURT:

_____
GEORGE FEARING, Chief Judge

**FILED**
**JUNE 13, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37714-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAYMUNDO CASARES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — In 2015, a man walked up to a trio of young men, pulled out a handgun and began shooting. Oscar Gutierrez was killed and his brother, Jorge Gutierrez, was struck by two bullets and paralyzed. Shortly after the shooting several witnesses were shown a photograph lineup of potential suspects. Two witnesses identified Ramundo Casares as the shooter. A jury found Casares guilty, and he was sentenced on one count of aggravated first degree murder, two counts of attempted first degree murder and one count of second degree unlawful possession of a firearm.

On appeal, Casares raises four main issues. He contends that: (1) the trial court abused its discretion by admitting pre-trial eyewitness identifications of Casares because the identifications were obtained using unnecessarily suggestive procedures and were not otherwise reliable, (2) insufficient evidence supported one count of attempted murder, (3)

No. 37714-8-III
*State v. Casares*

the trial court improperly allowed ER 404(b) gang expert testimony, and (4) his counsel

was ineffective in failing to strike certain evidence. Finding no error, we affirm.

BACKGROUND[1]

On May 9, 2015, Jorge Gutierrez and his brother, Oscar Gutierrez, were hanging

out with their cousin, Oscar Garcia-Gutierrez in the parking lot of Jorge's apartment.

Oscar Gutierrez was sitting in the passenger seat of his cousin's car, Jorge Gutierrez was

standing outside the driver's door of the same car, and Oscar Garcia-Gutierrez was

standing at the trunk. At the time, Jorge was wearing a significant amount of blue

clothing: blue Vans shoes, blue Dickey pants and a blue Dodgers cap. As the group

conversed, they noticed a car drive by slowly two times and then saw an individual

approach the group.

Jorge later testified that the individual "just came to us throwing his—to be

specific North Siders gang. . . . [H]e said North Side mother fuckers." Rep. of Proc.

(RP) at 434-35. When the man asked, "you bang?" the group responded, "No, we don't.

Why?" RP at 515.

Concerned there would be a fight, Jorge started to go around the car door when the

individual pulled a hand gun wrapped in a red bandana from his waistband and started

shooting. The first shot missed Jorge but he heard his brother, sitting in the passenger

_____

[1] While we provide general background information here, we add relevant details
in the analysis section of the opinion.

2

seat, say "no, no, no; don't shoot" before being struck by the second shot. Still standing

by the trunk, Oscar Garcia-Gutierrez saw the second shot hit his cousin "and then he shot

our way." RP at 515. As Jorge turned away, one bullet struck him in the back and

another on the thigh. Oscar ran around the building without being hit.

Neighbors Francisco Rosales and Joyce Wassemiller both heard gun shots and saw

a man running from the area with a gun. Brayan Gutierrez, then twelve years old, was

playing in the backyard when he heard "more than 10" gun shots and ran toward his

brothers. RP at 408. When he got out front, he saw the shooter run toward the corner.

As a result of the shooting Jorge was paralyzed and his brother Oscar Gutierrez

died at the hospital.

The witnesses gave various descriptions of the shooter to police. Oscar Garcia-

Gutierrez described the shooter as having a neck and face tattoo. Brayan Gutierrez also

described the shooter as having a neck tattoo. Jorge described the shooter as having a

distinctive face tattoo, with two lines and four dots. Francisco Rosales did not describe

the shooter as having any tattoos.

Based on the descriptions given, police compiled a black and white photograph

lineup of possible suspects. Each witness was presented with the same six pictures,

shown in the same order, with Casares's picture placed fourth in the lineup. Two of the

persons in the lineup had distinctive neck tattoos. Two persons in the lineup, including

Casares, had face tattoos. Casares did not have a neck tattoo and was the only one in the

lineup with a face tattoo that had two bars and four dots. However, in the lineup photograph, Casares's face tattoo is indistinct and unrecognizable.

When presented with the photo lineup, Oscar and Brayan were unable to make an identification, but Jorge and Francisco Rosales both identified Casares as the shooter.[2]

Casares was arrested twelve days after the shooting in Snohomish County. At the time of his arrest, he was found in possession of a black duffle bag containing a revolver wrapped in a red bandana and a 9mm handgun with a loaded magazine.[3] In a separate bag, police found .38 caliber ammunition. Police also found various red clothing including a red Chicago Bulls baseball cap and plastic bag containing another red bandana. Also included in the bag was a picture of a deceased male in a casket, later identified as "Mr. Silent," a main "shot caller" for the Norteño gang in Yakima.

The State charged Raymundo Casares with one count aggravated first degree murder, one count second degree murder, two counts first degree attempted murder, two counts first degree assault, and second degree unlawful possession of a firearm. The second degree murder aggravator included intent to "directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for criminal street gang . . .

---

[2] Oscar Garcia-Gutierrez later conducted his own search of social media and, after seeing news reports of Casares's arrest, contacted police and indicated that he was sure Casares was the shooter. At trial, and without objection, Garcia-Gutierrez identified Casares as the shooter.

[3] The State did not allege that either of these firearms were used in the shooting.

4

. its reputation, influence, or membership." Clerk's Papers (CP) at 147. Additionally, the first degree murder aggravator alleged that the murder was committed "to obtain or maintain [ ] membership or to advance [ ] position in the hierarchy of an organization, association, or identifiable group." CP at 146.

*Motion to Suppress pre-trial identifications*

Prior to trial, Casares moved to suppress the pre-trial identifications made by Jorge Gutierrez and Francisco Rosales. Casares argued that the photographs were unduly suggestive and the identifications were not otherwise reliable. The State filed a response and attached the pre-identification admonitions given to each witness along with the photographs shown to the witnesses. The State also produced a video taken at the hospital showing Jorge as he viewed the photograph lineup. Casares did not call any witnesses or produce evidence in support of the motion to suppress.[4]

Based on the record before it, the trial court found that Casares's photograph was suggestive. The court noted that Casares' face tattoo, while indistinct and difficult to see, could draw a witness's attention to his photograph. The court also noted that Casares' photograph was framed differently than the others, and included his chest whereas the

---

[4] Casares moved in limine to admit the expert testimony of Dr. Geoffrey Loftus at trial and proffered that he would testify about the fallibility of eyewitness identifications. The motion was not decided, and it does not appear that Dr. Loftus testified at trial. Casares did not introduce or proffer any of the evidence in support of his motion to suppress.

other photographs were headshots. Nevertheless, after applying the *Biggers*[5] factors, and considering the totality of circumstances, the court determined the identifications were reliable and admissible.

*Motion to Allow Gang-Related Expert Testimony*

The State filed a pre-trial motion to allow Officer Jim Ortiz of the Sunnyside Police Department to testify at trial as a gang expert, and specifically about the Norteño and Soreño gangs in the Yakima area. The State argued that the evidence was relevant to show that the crime was gang related, Casares was a member of the Norteño gang, and he had a motive to shoot at the group of men. Casares raised several objections to the proposed testimony.

At the pre-trial hearing, Officer Ortiz provided a foundation for his proposed trial testimony. He testified about his qualifications and experience working with the Norteño and Soreño gangs in Yakima. He provided testimony on the meaning of certain colors, symbols and tattoos in the gang culture. He provided an opinion based on the evidence in the case that the shooting was gang related, Casares was a member of the Norteño gang, and the victims wearing blue clothing could be mistaken for rival gang members.

The trial court originally reserved ruling on the motion to see what evidence would come in during the trial to support Officer Ortiz's opinions. At trial, the State

---

[5] *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

presented additional evidence to set the foundation for Officer Ortiz's opinions and support the State's theory of the case.

Ultimately, the court excluded specifics about prior contacts with Casares, but allowed Officer Ortiz to testify that Casares was affiliated with the Norteño gang based generally on prior contacts as well as evidence discovered in this case. The trial court found that the statements "North Sider," "you bang" and the red bandana-wrapped murder weapon were evidence that the crime was gang-related, and that expert testimony would be helpful to a jury because the meaning of these things are not common knowledge. The purpose of admission was motive tethered to the specifics of the case. Officer Ortiz testified at trial consistent with his pre-trial testimony.

At trial, Jorge Gutierrez and Oscar Garcia-Gutierrez identified Casares as the shooter; the neighbor, Francisco Rosales, despite his earlier identification, did not identify Casares.

The jury returned guilty verdicts on all counts and aggravating circumstances. The trial court vacated and dismissed counts 2, 4, and 6 on double jeopardy grounds. In the end, Casares was sentenced for aggravated first degree murder, two counts of attempted first degree murder, and second degree unlawful possession of a firearm.

Casares timely appealed.

ANALYSIS

PRE-TRIAL IDENTIFICATIONS

The first issue we address is whether the trial court abused its discretion by admitting the pre-trial identifications made by Jorge Gutierrez and Francisco Rosales. Casares contends that the trial court violated his due process rights by admitting unreliable eyewitness identifications. Specifically, Casares assigns error to the court's finding that indicia of reliability surrounding the identifications was sufficient to overcome suggestive procedures used by law enforcement. For the first time on appeal, Casares argues that the federal test for determining reliability has been undermined by decades of empirical research, and we should hold that the Washington Constitution requires a greater showing of reliability.

We stayed our opinion in this case pending the Supreme Court's decision in *State v. Derri*, 199 Wn.2d 658, 511 P.3d 1267 (2022), after which the parties provided supplemental briefing. In *Derri* the Court held that when the federal due process clause is properly raised and developed on the record, the clause requires courts to apply relevant and widely accepted modern science on eyewitness identifications in determining whether the procedures used were suggestive and whether the identifications were otherwise reliable. *Id*. at 674-75.

In light of *Derri's* holding and Casares' failure to raise the state constitutional issue below, we decline to consider whether the state constitution provides greater

protection and instead decide this issue under the federal due process clause as interpreted by *Derri*. *See* RAP 2.5(a). On the record developed by the parties below, we hold that the trial court did not abuse its discretion by concluding that, under the totality of circumstances, the identifications were not "so unnecessarily suggestive as to create 'a very substantial likelihood of irreparable misidentification.'" *Id*. at 685-86 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)) (internal quotation marks omitted).

A. Preliminary Issues

We invited the parties to submit supplemental briefing to address *Derri*'s application to the issues raised in this case. In his supplemental brief, Casares raises five new assignments of error. The State correctly points out that supplemental briefs cannot raise new assignments of error. RAP 10.3(a)(4). *See State v. Hudson*, 124 Wn.2d 107, 120, 874 P.2d 160 (1994) (denying review of constitutional claim raised for the first time in supplemental brief). In Casares' original brief, he assigned error to the findings that Jorge and Mr. Rosales' identifications were reliable because their initial descriptions were accurate, the witnesses were confident, and the timing was short. Accordingly, these are the issues that we will address.

B. Additional Relevant Facts

Shortly after the shooting, four witnesses provided descriptions of the shooter. Based on these descriptions, police put together a photograph lineup of six men who

9

matched the general description. As noted above, two of the persons in the lineup had distinctive neck tattoos. Two persons in the lineup, including Casares, had face tattoos. Casares was the only one in the lineup with a face tattoo that had two lines and four dots. Two of the witnesses, Jorge Gutierrez and Francisco Rosales identified Casares as the shooter.

Jorge Gutierrez was standing near the driver's door of a car when the shooter approached. Jorge was shot twice as he ran away. He described the shooter as having a "14" tattooed on the left side of his face using a combination of lines and dots. Otherwise, he described the shooter as light skinned, short hair, wearing shorts and a black shirt. Five days after the shooting, he was presented with the photograph lineup while still in the hospital, and the procedure was recorded with video and audio. When Jorge was handed the photograph of Casares, he paused for a long period and held on to the photo. After viewing the rest of the photographs, Jorge went back to Casares' photograph and "definitely" picked Casares as the shooter, indicating "it was this fool," and began to cry. CP at 92. He later expressed doubt about his choice after talking to his cousin Oscar Garcia-Gutierrez.

Neighbor Francisco Rosales heard gun shots and saw the shooter running toward him. He initially told police that he could not provide a description of the shooter but in a subsequent interview described the shooter as shorter than Detective Prieto (who is five feet nine inches), with shorter hair. He did not describe the shooter as having a tattoo.

Two days after the shooting, Francisco was shown the photo lineup and was "100 percent certain" that Casares was the shooter. CP at 95. When interviewed later by the parties, Francisco stated that he was confident he could identify the shooter if he saw him again.

Before being shown the photo lineup, each witness was read a standard admonishment. Each witness was shown the same six black and white photographs sequentially in the same order. Casares' photograph was placed fourth in the lineup. Although not argued below, the State conceded at oral argument that police did not employ a double-blind procedure when presenting witnesses with the photographs.

In reviewing the lineup, the court noted that several of the photographs contained persons with tattoos. Casares' facial tattoo was "very indistinct," and difficult to even see, but could be discerned if a witness had seen the defendant previously. The court was more concerned that Casares' picture had different framing and showed Casares from the mid-chest up instead of headshots like the other photographs.

Ultimately, given Casares' unique facial tattoo and the framing of his photograph, the court concluded that "photograph number 4, is suggestive." CP at 226. Nevertheless, in applying the totality of circumstances to the *Biggers* factors, the court concluded that the identifications by Jorge Gutierrez and Francisco Rosales were sufficiently reliable to overcome any suggestiveness.

Specifically, the court found that Jorge had the opportunity to observe the shooter, he had a significant degree of attention, his identification was accurate, his level of certainty was extremely high, and he made the identification within a week.

The trial court also found that Rosales' photomontage identification was reliable. It supported this conclusion by each *Biggers* factor. The court found that Rosales had the opportunity to observe the shooter, had a significant degree of attention, his identification was accurate, his certainty was 100 percent, and he made the photomontage identification within two days.

### C. Standard of Review

We review a trial court's decision to admit evidence for abuse of discretion. *State v. Kinard*, 109 Wn. App. 428, 435, 36 P.3d 573 (2001). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. *Id.* at 435. We consider whether the challenged findings of fact are supported by substantial evidence and whether those findings support the court's conclusions. *Derri*, 199 Wn.2d at 676.

### D. Due Process Prohibition Against Admitting Unreliable Evidence

Casares raises two related issues concerning the trial court's admission of the eyewitness's pre-trial identifications. First, he challenges the trial court's conclusion that the identifications were sufficiently reliable to overcome the suggestive procedures employed by law enforcement. Second, he argues that our state constitution provides more protection and requires a heavier burden to overcome a suggestive procedure.

12

Due process bars the admission of eyewitness identification obtained through unnecessarily suggestive procedures unless the identification is nevertheless reliable under the totality of the circumstances. *Id.* at 663. In 1977, the United States Supreme Court identified several factors to consider in determining whether a police procedure was unnecessarily suggestive. *Manson*, 432 U.S. at 114. In *Derri*, our state Supreme Court held that the federal due process clause requires trial courts to apply widely accepted modern science on eyewitness identification during each step of the *Brathwaite* test: when determining if a procedure is unnecessarily suggestive and when determining if the identification was otherwise reliable. *Derri*. 199 Wn.2d at 675.

The defendant bears the burden of establishing, by a preponderance of the evidence, that the police used unnecessarily suggestive identification procedures. *Id*. at 674. Where a defendant meets their burden of demonstrating that procedures employed were unnecessarily suggestive, the court must then consider whether the identification still possesses sufficient aspects of reliability so that the identifications do not violate due process. *Id.* at 674-75. This test requires the court to weigh the aspects of reliability against the corrupting effects of the suggestive procedure. *Id*. at 675. The court considers the totality of the circumstances to determine whether "the unnecessarily suggestive procedure created 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 674 (quoting *Brathwaite*, 432 U.S. at 116) (internal quotation marks omitted).

13

*Suggestive Procedure*

Since *Brathwaite*, a significant amount of additional research has been conducted on suggestive procedures and factors that tend to support the reliability of eyewitness identifications. *Derri*, 199 Wn.2d at 675. In *Derri*, the court held that trial courts considering whether an identification should be suppressed must consider not only historical factors on suggestiveness and reliability, but also modern scientific data that has been widely accepted. *Id.* For instance, widely accepted research has concluded that:

> identification procedures should be administered in double-blind fashion, meaning the administrator does not know who the suspect is. Police should give preidentification admonitions informing the witness that the perpetrator may or may not be in the montage and the witness should not feel compelled to make a selection. They should never show the same suspect to the same witness over the course of multiple identification procedures. They should construct a photomontage in such a way that the suspect is not the only individual pictured who closely matches the description of the perpetrator. And they should avoid giving feedback to witnesses that might inflate confidence levels

*Id.* at 677.

In this case, the police employed several techniques to reduce the suggestiveness of the lineup. They read each witness an admonition that the perpetrator may or may not be in the lineup and the witness should not feel compelled to make a selection. The photographs were shown to each witness in sequential order as opposed to being presented as a montage. There is no evidence that Casares' photograph was shown to the witnesses multiple times. And there is no indication that police gave any feedback to the

witnesses about their identifications. Nevertheless, the trial court found that Casares'

photograph was unduly suggestive.

Understandably, Casares does not challenge the trial court's finding that his

photograph was suggestive, but he does argue that the trial court did not give the

suggestive procedures enough weight when balancing them against aspects of reliability.

In his motion below, Casares argued that his photograph was unduly suggestive because

he was the only person in the lineup with a distinctive face tattoo. He did not submit any

additional evidence or expert testimony in support of his motion. The State argues that

the scientific evidence Casares refers to on appeal was not presented to the trial court and

should not be considered on appeal.

Casares had the burden to fully develop the record before the trial court on factors

that indicate suggestiveness. *Id*. at 674. In considering whether the trial court abused its

discretion, we consider only the factual record that was before the court when it ruled on

the motion to suppress. *State v. Derri*, 17 Wn. App. 2d 376, 395 n.3, 486 P.3d 901

(2021). We do not consider evidence that was presented later during trial or on appeal.

We note, however, that the scientific evidence considered in *Derri* not only changed the

factors to consider but also the weight assigned to various factors. To the extent that the

trial court made findings on relevant factors here, we can consider the findings in light of

*Derri*. But where the record is insufficient to consider a particular factor, we will not

make independent findings on disputed facts. *See Derri*, 199 Wn.2d at 679 (finding that

15

the record was insufficient to consider whether suspect's photograph with a neck tattoo increased suggestiveness when none of the witnesses described the suspect as having a neck tattoo).

While Casares' photograph was suggestive, the level of suggestiveness for each of the two witnesses varies because each witness gave different descriptions of the suspect. Jorge Gutierrez described the shooter as having a "14" tattooed on the left side of his face using a combination of lines and dots. He described the shooter as light skinned with short hair. Francisco Rosales described the shooter as shorter than the detective, but did not describe any tattoos.

A photo lineup can be suggestive when it "'directs undue attention to a particular photo.'" *Derri*, 199 Wn.2d at 678 (quoting *State v. Eacret*, 94 Wn. App. 282, 283, 971 P.2d 109 (1999) (per curiam)). This rule is generally applied when a witness describes a suspect with a distinctive feature and the defendant is the only person in the lineup with that distinctive feature. *Id.* However, this rule does not necessarily apply when a witness does not describe the suspect with a distinctive feature. *Id.* at 678-79.

Here, the trial court noted that several of the persons in the photo lineup had distinctive tattoos. Two other people had neck tattoos and one other person had a face tattoo near his eye. While Casares is shown with a face tattoo that matched the description given by Jorge Gutierrez, the tattoo is indistinct in the black-and-white photographs shown to the witnesses unless a person knew the tattoo was there. Casares'

16

indistinct face tattoo makes his photograph suggestive as to Jorge Gutierrez but not as to Francisco Rosales.

The trial court also found Casares' photo was suggestive because it was framed differently than the others; from a wider angle than the close-up head shots of the other five photographs. Casares does not defend this finding on appeal, and the State does not challenge it. We note that Casares' photograph is framed slightly different than the other photographs. For purposes of this appeal, we accept the trial court's finding that the framing was somewhat suggestive.

Casares argues for the first time on appeal that the lineup procedure was suggestive because it was not conducted in a double-blind fashion. Although this factor was not raised below, the State conceded at oral argument that a double-blind procedure was not used. We accept this concession and consider this factor in determining whether the trial court abused its discretion by denying Casares' motion to suppress the eyewitness identifications.

In sum, the lineup procedures were unduly suggestive because Casares' photograph was framed differently and police did not employ a double-blind procedure. Additionally, Casares was the only person in the lineup with the unique face tattoo described by Juan Gutierrez. We turn to whether the identifications possessed sufficient aspects of reliability and weigh them against the suggestive procedures.

*Aspects of Reliability*

When a defendant meets their burden of showing that procedures employed were unnecessarily suggestive, the court considers the totality of the circumstances as it balances the suggestive procedure against aspects of reliability. *Derri*, 199 Wn.2d at 674. The United States Supreme Court has determined that the "aspects of reliability" to be considered include the five factors laid out in *Biggers*:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the procedure, and (5) the time between the crime and the identification procedure.

*Id*.

In addition to the *Biggers* factors, courts should also consider any relevant "estimator variables" that may affect reliability. *Id*. at 686. "'Estimator variables' are environmental or individual variables not under the control of the police but 'equally capable of affecting an eyewitness' ability to perceive and remember an event.'" *Id.* at 676 (quoting *State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (2011)). Distance, lighting, witness characteristics, stress, presence of a weapon, and duration of observation are all examples of estimator variables. *Id.* at 686, n.23.

Here, the trial court entered findings on each of the *Biggers* factors. The trial court found that, as a direct victim of the shooting, Jorge had a significant opportunity to see the assailant's face. The trial court also determined that Rosales had been able to see

the assailant's face because he was "face on" with the assailant as he fled the scene. RP at 397. Both of these facts weigh in favor of reliability.

The trial court also found that both Jorge and Rosales paid a high degree of attention during and after the shooting and were able to provide accurate descriptions of the assailant prior to the photo lineup. Jorge was able to specifically describe the tattoo on the assailant's face. Rosales described the shooter as shorter than the detective interviewing him and having shorter hair. The trial court noted that although Rosales' description was limited, Rosales also said he was confident that he would be able to identify the shooter if he saw him again. Nothing before the trial court indicated that Rosales' description was inaccurate, it simply was not detailed.

In *Derri*, the court indicated that the accuracy of a prior description should be given limited weight. If the witness's later identification differs from their initial description, then the difference weighs against a reliable identification. Otherwise, a consistent description and identification have limited value. *Id.* at 688.

Citing *Derri*, Casares also argues that each witness's degree of attention was impacted by the stressful situation, including the presence of a weapon. In support of his contention that the witnesses experienced stress, Casares points to their trial testimony. This particular factor was not raised during the motion to suppress. Evidence on this factor was not presented to the trial court, and the trial court made no findings on this factor. Thus, the record is insufficient to consider this factor on review. *See Id.* at 677.

The trial court also found that the level of certainty for both Jorge and Rosales at the time of their identification was extremely high. However, under *Derri*, this does not weigh in favor of reliability where the procedure was unnecessarily suggestive. *Id.* at 688-89. Rather, a low degree of certainty would weigh against reliability.

As to the timing of the identifications, Jorge identified Casares in the photo lineup five days after the shooting, and Rosales identified Casares two days after the shooting. In *Derri*, the court determined that an identification nine days after the incident weighed neither for nor against reliability noting that misidentifications substantially increase from 2 to 24 hours after an event. *Id.* at 689. Here, although it was still outside the 24-hour range, the time frame was significantly shorter, especially in the case of Rosales. Thus, this factor weighs slightly in favor of reliability.

Finally, we note that the fact that both Jorge Gutierrez and Francisco Rosales independently identified Casares renders the identifications more reliable. *See Id.* at 690.

On this record, we conclude that the trial court did not abuse its discretion by denying Casares' motion to suppress the pre-trial identifications made by Juan Gutierrez and Francisco Rosales. The suggestiveness of the procedures was not significant and does not outweigh the indicators of reliability. Under the totality of the circumstances presented here, the identification procedures were not so unnecessarily suggestive as to

No. 37714-8-III
*State v. Casares*

create "'a very substantial likelihood of irreparable misidentification.'" *Id*. at 685-86

(quoting *Brathwaite*, 432 U.S. at 116).[6]

IN-COURT IDENTIFICATION BY OSCAR GARCIA-GUTIERREZ

For the first time on appeal, Casares challenges the in-court identification made by

Oscar Garcia-Guiterrez. Garcia-Guiterrez is Jorge Guteirrez's cousin and was standing

by the trunk of the car when the shooter approached and began shooting. When shown

the photograph lineup, he did not make an identification. Later, after conducting his own

investigation, Garcia-Gutierrez was certain that Casares was the shooter and identified

him as such during the trial.

We decline to address this issue because it was not preserved below, the record is

not sufficiently developed, and the trial court made no findings or conclusions with

respect to Garcia-Gutierrez's in-court identification. RAP 2.5(a)(3).

SUFFICIENCY OF EVIDENCE FOR ATTEMPTED MURDER CONVICTION

Casares challenges the sufficiency of evidence to support his conviction for

attempted murder in count 5 against Oscar Garcia-Gutierrez.[7] Evidence is sufficient to

support a guilty verdict if any rational trier of fact, viewing the evidence and inferences in

---

[6] Casares also challenges Jorge Gutierrez's in-court identification, arguing that it is tainted by the inadmissible pre-trial identification. Because Gutierrez's pre-trial identification was admissible, it did not impermissibly taint his in-court identification.

[7] In his opening brief, Casares also challenges count 6, first degree assault, but the trial court vacated this charge at sentencing.

21

the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When a defendant challenges the sufficiency of the evidence, he or she admits the truth of all of the State's evidence. *Id.* Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Accordingly, we must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). In determining the sufficiency of the evidence, we do not consider circumstantial evidence any less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

That jury was instructed: "To convict the defendant of the crime of attempted murder in the first degree in Count 5, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about May 9, 2015, the defendant did an act that was a substantial step toward the commission of murder in the first degree by shooting at Oscar Garcia-Gutierrez; (2) That the act was done with the intent to commit murder in the first degree; and (3) That the act occurred in the State of Washington." CP at 189.

The evidence was sufficient to support the conviction of attempted murder against Oscar Garcia-Gutierrez. At trial, Garcia-Gutierrez testified and drew a diagram showing that he was within a few feet of his cousin, Jorge Gutierrez, when the shooting began.

Testimony indicated that after Jorge's brother, Oscar Gutierrez, was struck once in the car's passenger seat, "he shot our way" meaning toward Jorge and Garcia-Gutierrez. Jorge stated in his interview that "he was gonna shoot my cousin too," meaning Oscar Garcia-Gutierrez. At least two shots struck Jorge and the shooter kept firing and a total of nine shell casings were found. The proximity of the persons present and the number of gun shots fired at them are a substantial step toward causing death. The evidence also implies intent to kill all three men around the car.

EXPERT TESTIMONY ON GANG CULTURE AND AFFILIATION

Next, Casares raises several challenges to the trial court's decision to allow Officer Ortiz to testify that Casares was a gang member. He contends that Officer Ortiz's opinion was too generalized, based on evidence that was too attenuated in time to be relevant, and unhelpful to the jury. As we noted above, we review a trial court's evidentiary rulings for manifest abuse of discretion. *Kinard*, 109 Wn. App. at 435.

A. Additional Relevant Facts

The State moved in limine to admit the testimony of Officer Jim Ortiz as an expert on local gang culture. Casares objected under ER 702 and 404(b). During a pre-trial hearing, Officer Ortiz answered the State's proposed trial questions establishing his experience and qualifications working with the Norteño and Soreño gangs in Yakima Valley. He interpreted the meaning of evidence related to specific numbers and colors, indicating that the Norteño gang was associated with the number 14 and the color red,

whereas the number 13 and the color blue was associated with the Soreño gang. He also testified that the two gangs are "mortal enemies" and "[i]f they see each other a confrontation is going to happen," often times with violent outcomes. RP at 15. Under the current gang structure, members of both gangs increase their status or hierarchy by perpetrating acts of violence. The greater the violence and the more time put into it, the higher up a member's status will move. Officer Ortiz testified that members of both gangs usually move to Snohomish or Skagit Counties "whenever something major happens." RP at 34.

Officer Ortiz provided evidence to support the State's theory that the shooting was gang related and the shooter was a Norteño gang member. Officer Ortiz testified that the term "North sider" was used by Norteños to identify themselves, and the question "you bang?" was said by one gang member to another before an assault. Colored bandanas are used by the two gangs as "flags," and wrapping a gun in their gang's flag was normal behavior. Moreover, a victim wearing predominantly blue clothing could be mistaken for a Soreño gang member.

When Officer Ortiz testified that Casares "is" a gang member, the court sustained defense counsel's objection. Officer Ortiz clarified that the items found in Casares' possession at the time of his arrest were "associated with a Norteño gang member." RP at 755. These included red clothing, a gun wrapped in a red bandana, and a picture of a deceased gang leader. Additionally, Casares' facial tattoo, with two bars and four dots,

was a symbol for the number 14, associated with the Norteño gang. Based on Casares'

possessions and tattoos, Officer Ortiz opined that Casares was a Norteño.

The trial court reserved ruling on the motion to see if the specific evidence

supporting Officer Ortiz's opinions would be admitted at trial.

When the motion was readdressed, the trial court made specific findings under ER

404(b) that the gangs existed in Yakima Valley and that Casares was a member of the

Norteño gang. The court found that Officer Ortiz's opinions were tethered to the specific

evidence in this case and relevant to show motive. The court also found the testimony

helpful as the information provided was not common knowledge. Finally, the court

determined that the narrowly-tailored opinions of Officer Ortiz were more probative than

prejudicial.

The court allowed Officer Ortiz to provide his opinion testimony so long as it

stayed specific to the evidence in this case and did not wander into the realm of

generalized opinions on gangs. The court also limited testimony about details of prior

contacts with Casares except for "sanitize[d]" statements as to awareness of his

affiliation. RP at 81-83. Ultimately, the court allowed Officer Ortiz to provide an

opinion that the shooting was gang related, the shooter was most likely a member of the

Norteño gang, and Casares was a member of the Norteño gang.

During cross-examination, Officer Ortiz admitted that he had not seen Casares in

years, did not know what Casares had been doing with his life, and had not seen him on

25

the date of the shooting.  Officer Ortiz also admitted that it is possible for gang members

to leave a gang, move away, and lead a normal life.

B.  Analysis on Admissibility of Gang Expert Testimony

On appeal, Casares challenges several aspects of Officer Ortiz's testimony.  He

contends that the trial court abused its discretion by allowing Officer Ortiz to testify that

Casares was a Norteño gang member because there was no evidence that he was a gang

member at the time of the shooting, the evidence was inadmissible to prove identity, and

inadmissible to prove motive because motive was not an issue.  We disagree.

Under ER 404(a), evidence of prior acts is inadmissible to show that a person

possessed a particular character and acted in conformity with that character.  In a criminal

case, character evidence cannot be introduced to show that a defendant is generally a

dangerous person or has a general propensity to engage in criminal behavior.  ER 404.

However, evidence of prior acts can be introduced for other purposes, such as proving

motive, intent, and identity.  ER 404(b).

When the State proposes evidence of prior acts, the trial court is required to

determine the conduct occurred, identify the purpose of the proposed evidence, determine

whether the evidence is relevant and necessary, and conclude that the probative value

outweighs the prejudicial effect.  *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348

(2017).

Evidence of gang affiliation is inherently prejudicial and should be addressed with

caution:

> In the context of a criminal trial, gang evidence is a double-edged sword. On the one hand, such evidence can help jurors understand relationships between defendants and how various symbols and terminology suggest motive and intent. But on the other hand, gang evidence can be problematic. Merely suggesting an accused is a gang member raises the concern he or she will be judged guilty based on negative stereotypes as opposed to actual evidence of wrongdoing. Accordingly, the State's use of gang evidence requires close judicial scrutiny.

*State v. Mancilla*, 197 Wn. App. 631, 637, 391 P.3d 507 (2017).

"Mere evidence of gang affiliation is not sufficient to meet the State's burden"

under ER 404(b), especially when used to show a person's general beliefs or associations.

*State v. Arredondo*, 188 Wn.2d at 258 (citing State v. Asaeli, 150 Wn. App. 543, 578,

208 P.3d 1136 (2009)); *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). But

evidence of gang affiliation can be helpful when tied to the specifics of the case and used

to show motive and intent. *Mancilla*, 197 Wn. App. at 637. In order to introduce

evidence of gang affiliation, the State must show a nexus between the crime and the gang

membership. *See State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995).

In *Mancilla*, this court largely upheld Officer Ortiz's testimony about the local

Norteños and Sureños gang culture in Yakima. We noted in that case that Officer Ortiz's

testimony was helpful in explaining the relevance of specific evidence, including blue

graffiti and the colors worn by the defendants when they were arrested. 197 Wn. App. at

644. We held that Officer Ortiz's testimony was directly related to the evidence admitted in the case and "supplied the jury with the tools necessary to interpret this evidence and understand the State's theory of the case." *Id*.

In *Arredondo*, the Supreme Court upheld the trial court's decision to allow evidence that the defendant, a known Norteño gang member, was involved in a prior drive-by shooting involving a Soreño house because it demonstrated the defendant's particular animosity toward rival gang members. 188 Wn.2d at 259. "This animosity goes beyond the routine friction between gangs, or even the 'history of bad blood' between these particular gangs." *Id*. Instead, it tended to show that the high degree of animosity that the defendant held toward members of the Soreño gang. *Id*. at 260-61. Notably, the Court went on to find that the evidence was insufficient to show identity because the two incidences of drive-by shooting were not sufficiently similar to show a unique modus operandi. *Id*. at 261.

C. Application

In this case, the trial court made specific findings under ER 404(b) and 403, and then limited the testimony that would be admitted at trial. After the State laid its foundation, Officer Ortiz's testimony explained the relevance of otherwise innocuous evidence such as the statements made by the shooter, the relevance of a gun wrapped in a red bandana, the colors worn by the victims, Casares' tattoos, and the items found in his possession when he was arrested. Based on this evidence, Officer Ortiz testified that the

shooting was gang related, the shooter was a member of the Norteño gang, and Casares was a member of the Norteño gang.

Casares argues that Officer Ortiz's expert testimony was irrelevant because there was no evidence that he was a gang member at the time of the shooting. Relying on *State v. Everybodytalksabout*, 145 Wn.2d 456, 468, 39 P.3d 294 (2002), he contends that Ortiz's opinion was based on contacts from years prior and was too attenuated to be relevant.

In *Everybodytalksabout*, a detective was allowed to testify that in his past encounters with the defendant and alleged accomplice, the defendant acted as a leader between the two. *Id*. at 468. The State relied on this evidence to argue that given this generalized leadership role, the defendant likely encouraged the accomplice to murder the victim. *Id*. at 464-65. The court held that this testimony was not relevant to the current charges of murder because the detective was not present at the time of the killing, his testimony did not relate to the specific incident leading up to the crime, and his observations were based on previous contacts too remote in time to be relevant. *Id*. at 468. In addition, the evidence was propensity evidence prohibited by ER 404(b). It was introduced to show the defendant was the leader between the two and likely acted in conformity with this quality at the time of the murder and therefore must have participated in the murder with the accomplice. *Id*.

29

Casares argues that like *Everybodytalksabout*, in this case, Officer Ortiz's opinion of his gang affiliation was based on contacts from several years prior and too attenuated in time to be relevant. We disagree. While Officer Ortiz's opinion was based in part on prior contacts, the trial court carefully excluded evidence of prior police contacts exactly along the lines of *Everybodytalksabout*. Instead, Officer Ortiz's opinion at trial was based on prior contacts plus Casares' current tattoos and the items in his possession when he was arrested. Officer Ortiz explained the significance of this evidence and testified the evidence supported his opinion that Casares was a member of the Norteño gang at the time he was arrested. Unlike in *Everybodytalksabout*, Officer Ortiz's testimony was based on evidence that was temporally relevant and specific to the case.

Casares also contends that Officer Ortiz's opinions were too generalized to be relevant. Casares contends that there was no evidence that he was a member of any particular subgroup that required violence in order to increase status. While Officer Ortiz testified that there are smaller subgroups within the two gangs, his testimony was about the culture of violence related to the two larger gangs. Casares contends that this testimony was irrelevant because Officer Ortiz failed to connect Casares with any specific sub-group that operated on a culture of violence. In support of his argument, Casares contends that there is a great deal of variety among gang subgroups and relies on evidence that was not introduced at trial.

While the evidence and arguments that Casares makes on appeal may be relevant on cross-examination and may have supported his opposition to the testimony, these arguments and evidence were not raised below. We therefore decline to consider them on appeal. RAP 2.5(a). Officer Ortiz's opinions were sufficiently specific to provide the necessary nexus to the evidence in this case. He testified that Casares was a member of the Norteño gang, that the Norteño and Soreño gangs operated on a culture of violence, and any smaller groups would identify with one of the larger gangs.

Casares also challenges Officer Ortiz's testimony that members of the Norteño and Soreño gangs tend to move to Snohomish and Skagit Counties when "something happens." RP at 753. He continuously claimed this evidence was generalized propensity evidence to explain why he would be living in Snohomish County when arrested. This argument fails as well.

First, as the State notes, despite Casares' claims on appeal, there is no evidence in the record that Casares was living with his girlfriend in Snohomish County. Instead, the only evidence is that he was arrested at his girlfriend's residence in Snohomish County. Second, the testimony was tied to the specific evidence in this case and would have helped explain why a member of the Norteño gang would be found in Snohomish County after being involved in a shooting against a suspected rival gang member.

Next, Casares argues that evidence of his gang membership was improperly admitted to prove identity. He contends that the testimony identifying him as a Norteño

31

was used by the State to argue that since a Norteño member was responsible for the shooting and he was a Norteño member, Casares must have been the shooter. But the expert testimony on gang affiliation was not introduced to prove identity. Instead, the court stated that the purpose of Officer Ortiz's testimony was to show motive: to show why Casares would walk up to a random group of men and start shooting. Casares' identity as the shooter was proved through the eyewitness identifications.

Citing *State v. Saltarelli*, 98 Wn.2d 358, 359, 655 P.2d 697 (1982), Casares argues that the expert testimony should not have been allowed to prove motive because motive was not an issue at trial. Instead, he argues that the only issue was the identity of the shooter. In *Saltarelli*, the defendant was charged with rape and conceded the act of intercourse, contesting only the existence of consent that rendered the issue of intent inconsequential by admission. *Id*. This case is distinguishable from *Saltarelli* in two ways: first, Mr. Casares has not admitted the shooting; second, motive was not at issue in *Saltarelli*. Even where the act of shooting proved the existence of intent sufficiently to render intent immaterial, the motive evidence here explaining why a shooting would occur does not become unnecessary merely because the defendant focused his theory on identity.

Finally, Casares argues that Officer Ortiz's testimony exceeded the bounds of ER 702 and crossed the line into improper fact testimony. The trial court found that Officer Ortiz was qualified as an expert on gang culture and his proposed testimony would be

helpful to the jury under ER 702.  Relying on *State v. McDaniel*, 155 Wn. App. 829, 230

P.3d 245 (2010), Casares contends that given Ortiz's prior testimony about colors,

numbers, and tattoos, the jury could reach its own conclusion on whether Casares was a

member of the Norteño gang.  Moreover, Officer Ortiz's testimony that Casares was a

"documented" gang member was factual and not an opinion.

In *McDaniel*, the court addressed the intersection between expert testimony that

can be based on evidence outside the record and expert testimony that violates the

confrontation clause.  The *McDaniel* court, quoting *United States v. Mejia*, 545 F.3d 179

(2d Cir. 2008), held that when an expert on gang activity simply repeats statements he

has heard from others instead of piecing together and analyzing relevant information for

himself, the expert testimony is inadmissible as hearsay in violation of the confrontation

clause.  *McDaniel*, 155 Wn. App. at 849.  In *Mejia*, the federal court recognized that

while helpful in decoding gang culture and communications, gang experts can stray from

the scope of their expertise by testifying as to the meaning of general conversations that

do not include code words, or by interpreting the meaning of specific slang terms based

on their interview during the case rather than referencing the fixed meaning of terms in

the narcotics world.  *Mejia*, 545 F.3d  192-93.

Casares acknowledges that Officer Ortiz's testimony about colors, numbers,

tattoos and gang culture was admissible under these cases, but claims that his opinion that

Casares was a Norteño went beyond what was helpful under ER 702.  The cases he cites

do not support his argument. Casares is not claiming that Officer Ortiz's opinion of his

gang membership is based on the hearsay statements of non-testifying witnesses.

Nothing in *McDaniel* or *Mejia* precludes an expert witness from providing an opinion on

gang membership based on physical evidence. In addition, as the State points out, Ortiz's

comment about Casares' gang membership being "documented" was elicited during

cross-examination and not challenged by defense counsel.

Here, expert testimony was used to explain the relevance of particular evidence

that may seem otherwise innocuous and inform the jury why a gang member carrying a

gun wrapped in a red bandana would shoot at three strangers, one wearing blue,

seemingly unprovoked. The trial court's decision to admit this evidence was not an

abuse of discretion.

INEFFECTIVE ASSISTANCE OF COUNSEL

Casares contends that his attorney was ineffective for failing to move to strike

evidence after objections were sustained and for failing to object to Officer Ortiz's

testimony that Casares was a "documented" gang member.

We review claims of ineffective assistance of counsel on a de novo standard of

review. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Under *Strickland*

*v. Washington*,[8] Mr. Casares bears the burden of showing (1) that his counsel's

performance fell below an objective standard of reasonableness based on consideration of

all the circumstances and, if so, (2) there is a reasonable probability that but for counsel's poor performance the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A defendant must affirmatively prove prejudice, not simply show that "the errors had some conceivable effect on the outcome." *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006). If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record for deficiencies, there is a strong presumption that counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. The burden is on a defendant alleging ineffective assistance of counsel to show deficient representation. *Id*. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

Whether to object or not is a "classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). In the context of objections, Washington courts presume "that the failure to object was the product of legitimate trial strategy." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). The failure to object to

---

[8] 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

evidence that may be inadmissible can be a legitimate trial strategy to avoid highlighting certain evidence. *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). Counsel may legitimately decide that objecting to inadmissible but low-value evidence may do more harm than good. *See generally id*. at 248-49. For this reason, "[a] few or even several failures to object are not usually cause for finding that an attorney's conduct has fallen below the objective standard of conduct." *Id*. at 250.

When an objection is sustained with no further motion to strike the testimony and no further instruction for the jury to disregard the testimony, the testimony remains in the record for the jury's consideration. *State v. Swan*, 114 Wn.2d 613, 659, 790 P.2d 610 (1990). While there are no published Washington cases that consider whether the failure to move to strike can be deficient, several unpublished cases have held that absent direct evidence to the contrary, the decision is considered strategic to avoid highlighting unfavorable testimony. *See State v. Kolb*, No. 46497-7-II, slip op. at *5-6 (Wash. Ct. App. Mar. 8, 2016) (unpublished), www.courts.wa.gov/opinions/pdf/D2%2046497 -7-II%20Unpublished%20Opinion.pdf; *State v. McNicholas*, No. 49363-2-II, slip op. at *10 (Wash. Ct. App. May 30, 2018) (unpublished), www.courts.wa.gov/opinions/pdf /D2%2049363-2-II%20Unpublished%20Opinion.pdf.

Casares identifies three instances where counsel did not move to strike evidence after defense counsel's objections were sustained. All three instances occurred during Officer Ortiz's testimony. These include testimony that:

36

(a) "violence is just automatic" for gang members [RP at 734];

(b) face tattoo means "He's a Norteno" [RP at 741]; and

(c) Casares "is" a Norteño gang member meaning currently [RP at 754].

For each of these statements, the trial court sustained objections, and the State moved on with its questioning.

Casares also contends his attorney was deficient for failing to object to Officer Ortiz's comment that Casares' gang membership was "documented." During cross-examination of Officer Ortiz, counsel questioned Ortiz on the basis of his opinion about Casares' gang status, suggesting that Ortiz's information was stale. Officer Ortiz responded:

> [Defense Counsel]: Okay. So when you testify about your opinion, what you can say is at some point in his life he was associated with the Norteno gang, right?
>
> [Officer Ortiz]: I don't think he was associated. He was a member.
>
> [Defense Counsel]: He told you that?
>
> [Office Ortiz]: We have it documented.
>
> [Defense Counsel]: He's told you that?
>
> [Officer Ortiz]: He hasn't told me.
>
> [Defense Counsel]: Okay. He hasn't told you he was a gang member. You haven't seen him in years. The best you could say is [at] one point you think he was a gang member?

[Officer Ortiz]: Based on all our criteria, yes.

RP at 759-60.

On appeal, Casares fails to demonstrate why defense counsel's decisions could not be strategic. Instead, Casares suggests that the failure to move to strike after a successful objection is categorically deficient. We decline to adopt this holding. The decision not to strike or not to object could be strategic in order to avoid highlighting unfavorable testimony. It is also reasonable that counsel chose instead to discredit the information through effective cross-examination. On this record, Casares has not demonstrated that his attorney's decisions were not strategic and has thus failed to show deficient performance.

CUMULATIVE ERROR

Casares argues that the cumulative errors of admitting unreliable eyewitness identification testimony and prejudicial evidence that Mr. Casares was a "documented" gang member deprived him of a fair trial. Since we find no error, we determine there is no cumulative error. *See State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000) (Even where individual non-constitutional errors standing alone would otherwise be considered harmless, cumulative error may warrant reversal).[9]

---

[9] In his statement of additional grounds, Casares points to particular evidence in the record suggesting the evidence is relevant to our analysis of the eyewitness identification issue, but he does not otherwise articulate any additional issues with the noted evidence.

No. 37714-8-III
*State v. Casares*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

No. 37714-8-III

FEARING, C.J. (concurring) — I disagree with one of the majority's rulings. I conclude that trial counsel performed ineffectively when failing to move to strike testimony ruled inadmissible.

The trial court sustained defense counsel's objections to Officer Jose Ortiz testifying that violence is automatic for gang members, a face tattoo means Raymundo Casares is a Norteño, and Casares is a Norteño gang member. Nevertheless, before counsel objected, Officer Ortiz uttered these harmful answers. Therefore, the court's sustaining of the objection posed no impediment to the jury considering these three remarks by Ortiz. *State v. Swan*, 114 Wn.2d 613, 659, 790 P.2d 61 (1990). It was as if the court overruled the objection. Because Ortiz already uttered the answer, counsel should have moved to strike the testimony and garnered an instruction from the trial court to the jury that it must not consider the testimony.

Trial counsel served no rational purpose by failing to move to strike the inadmissible testimony. The majority deems the failure to move to strike the evidence as a strategic decision. The record does not suggest such a strategy, but a strategy still needs to be reasonable. *State v. Vazquez*, 198 Wn.2d 239, 255, 494 P.3d 424 (2021). Trial

counsel had already drawn attention to the testimony by objecting. Asking the court to strike the testimony from the record would cause no further damage. Under the majority's theory of the case, defense counsel should have never objected to the testimony in the first place, because the objection drew attention to the answer.

In another context, the State typically contends that a jury follows a jury instruction directing the jury to consider evidence for one purpose but not for another purpose. *State v. Lough*, 125 Wn.2d 847, 864, 889 P.2d 487 (1995). This court acts inconsistently when agreeing with the State, under the context of this appeal, that the jury will ignore an instruction to disregard harmful testimony.

I realize that sometimes questions and answers come with such speed that defense counsel cannot timely object to inadmissible testimony. But counsel must be nimble and be quick. More importantly, counsel must recognize the rule that the jury may consider inadmissible evidence without a motion to strike.

To prevail on a claim of ineffective assistance of counsel, the accused must not only show that counsel performed ineffectively but also he suffered prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Based on the strength of other evidence, I conclude that the outcome of the trial would not have changed if the trial court had struck the inadmissible evidence.

I concur:

_____
Fearing, C.J.

2